Charles Edward **PADGETT**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–82–00026–CR.

Court of Appeals of Texas, San Antonio.

June 1, 1983.

Rehearing Denied Nov. 30, 1984.

Louis T. Rosenberg, David Chapman, San Antonio, for appellant.

Bill White, Dist. Atty., Sam Ponder, Robert Arellano, Miguel Martinez, Asst. Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, TIJERINA and DIAL, JJ.

## OPINION

BUTTS, Justice.

This is an appeal from a conviction for aggravated kidnapping. After a jury found appellant guilty, the trial court found both enhancement allegations in the indictment to be true and assessed his punishment at life imprisonment.

Appellant challenges the verdict by four grounds of error. We sustain his fourth ground: that a jury charge on the lesser included offense of kidnapping should have been given. We therefore reverse and remand the case to the trial court.

The indictment in this case alleges, in pertinent part:

> ... on or about the 13th day of August, 1980, CHARLES EDWARD PADGETT did then and there intentionally and knowingly abduct TRACY L. BECKWITH, by THREATENING TO USE

AND USING DEADLY FORCE with intent to TERRORIZE THE SAID TRACY L. BECKWITH; ...

The complainant was a 17-year-old who worked on the date of the offense at a Steak 'n Eggs restaurant on Harry Wurzbach Road in San Antonio. It was customary for one waitress to be the only employee on duty at that time of day, which was about 3:00 p.m. A couple left the restaurant, leaving only the appellant present. A neighborhood ranger patrolman came in, drank a cup of coffee, and left. Appellant then asked Beckwith to "watch his table" while he went outside for a moment. After agreeing to this, the complainant went to the restroom. When she later stepped out of the restroom, appellant seized her by the arm and pressed a gun against her lower back. She believed the gun to be a .45 caliber; it later proved to be a heavy pellet gun. She testified:

> Then he proceeded to threaten me, tell me that I had better cooperate and if I didn't, he would blow my brains out, and there was various bad language.

> When asked about the 'various bad language,' she replied that 'in all my statements I left the vulgar out.' She recalled that he said, instead of 'blow my brains out,' the words were, 'I'm going to blow your shit away.'

She was wearing a white uniform with an apron. He ordered her to remove the apron and leave it on the floor. Appellant also told her to leave her purse at the restaurant. He then walked her over to the cash register and told her to get the money, still with the gun against her back. She removed the bills only, less than $40.00, and he then put the gun in his waistband, placed his arm about her, and they walked out the door and went to the back parking lot.

Appellant put her in the front seat of his pickup, which had a Coleman camper on it, ordering her to put her head "down between my legs." She said she complied because she was afraid he might hurt her or shoot her. She also stated he had a conversation with "two black men" in another vehicle away from the pickup at the time, but she did not see them. She said the two other men wanted appellant to give her to them, but he refused. The patrolman testified otherwise, stating there had been no other vehicles on the parking lot when he was there.

Appellant drove the truck away, and, she stated, he repeatedly told her he would "drop" her off soon. He advised that they were driving through the Post (Fort Sam Houston), but she did not raise her head. She was perspiring and he told her to wipe her face with a towel, "and I being stubborn, I didn't want to ... I just didn't want to bother to look up or anything, and so finally he pulled my head up [by her hair] and smacked me with his back hand ... and jabbed me in the side with a gun, telling me I had better do what he said." She said she was afraid of him and wondered what he might do to her.

Appellant drove to Raymond Russell Park off Interstate 10 West. She said he put her in the camper and tied her hands with an electrical cord, her feet with cord from a hair blow dryer, and placed a handkerchief gag on her mouth. She stated there was no one around, although the defense pointed out this was summertime and a popular park. She said she did not attempt to cry out. She testified she threw the money (bills) at him in the cab while her head was down because she was "mad." They left Raymond Russell Park while it was still daylight and went to a service station. She did not attempt to call out because he had told her to be quiet or he would kill her and the attendant. She said she believed him.

They continued on I–10 West until they came to a roadside park with facilities. She had gone to sleep. When he was not in the cab, he "was always sitting in the back talking to her," she said, about his old war days, ripping off places like Tiffany's, girls he had taken, then raped, and it "turned into some big party" because the girls enjoyed it, people he had killed, taking girls and selling them. She said she did not believe all his stories.

He untied her feet when they arrived at the "comfort station," and took off the mouth gag, leaving her hands tied. She went to sleep before he did and awoke after he did on the two nights she was with him. She related he lay by her each night, on the camper floor, but did not attempt to have sexual relations with her nor to contact her sexually. He wanted her to call him "daddy," and he told her he was going to buy her a car, a house and a dog, and take her out and "show her off" to all his friends. He told a family at a rest stop she was his daughter.

The next morning they continued on to Ozona and stopped at a rest stop on a cliff [near Sheffield]. The water hose "broke," and while he repaired that, appellant untied Beckwith's hands. He had not threatened her any more, she said, after the first day. She remained untied after that. She was going to try to escape, she said, on the second night, but she fell asleep again. When she woke the next morning, appellant was helping a trucker with truck repairs at the rest stop. She sat on the tailgate of the pickup. She and appellant were sitting later at a picnic table when the officers arrested appellant. [This was for an unrelated offense, and the officers had a warrant and a description of his truck.] The testimony of an officer showed that other people were at the rest stop when they arrived.

Beckwith admitted on cross-examination that she had "gone to the restroom" away from appellant and that she had changed her clothes. Further she said she was alone much of the time in the camper and there were windows, but that she did not attempt to alert anyone that she was a captive. They went to a store and he bought snack food while she remained in the camper without a gag on her mouth the first evening. He untied her feet when they returned from the store. He permitted her to go to the restroom at the first comfort station. She stated she saw two knives in the camper and she knew their location in the camper. The arresting policemen found three knives in the camper. At the last rest stop, which had no facili-

ties, appellant let her climb a fence to go to the "restroom." The appellant did not testify nor offer other testimony.

*Kidnapping*, TEX. PENAL CODE ANN. § 20.03 (Vernon 1974) is the offense committed when a person intentionally or knowingly abducts another, and the jury charge so defined it in this case. The charge defined abduct by tracking the instant indictment and the statute. *Abduct*, § 20.01 of the penal code, means to restrain a person with intent to prevent his liberation by:

\* \* \* \* \* \*

(B) using or threatening to use deadly force.

It further defined *restrain* as restricting a person's movements, so as to interfere substantially with his or her liberty, by moving him or her from one place to another or by confining him or her. § 20.01(1).

*Deadly force* was defined for the jury as force that is intended or known by the person acting to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. *See*, TEX. PENAL CODE ANN. § 9.01(3) (Vernon 1974).

▮ Therefore, in the present case, the jury must initially find that the appellant intentionally or knowingly restrained Beckwith with intent to prevent her liberation by using or threatening to use deadly force [abduction]. These are the required elements of kidnapping. In order to elevate the offense to aggravated kidnapping the jury next must find that the kidnapping was committed *with intent to terrorize Beckwith*, § 20.04(a)(5), and the trial court so charged.

The term "terrorize" was not defined in the jury charge. A search of Texas cases reveals no definition nor, as yet, any conviction which rests upon subsection 5 of the aggravated kidnapping statute. We have drawn upon another source to guide us since appellant's first ground of error attacks the sufficiency of the evidence to

sustain a finding of appellant's specific intent to terrorize Beckwith.

Webster's Third New International Dictionary (1981) casts some light upon the meaning of "terrorize": It may mean to fill with terror or anxiety; or to coerce by threat or violence. Perhaps, to excite fear; or to rule by intimidation. p. 2361. Terrorism may be the systematic use of terror as a means of coercion. It may create an atmosphere of threat or violence. p. 2361. Terror may denote stark fear; a state of intense fright or apprehension. p. 2361. Terrorize, as distinct from terrify, often implies an intentional affecting with terror. p. 912 (frighten). *See also: Arto v. State,* 19 Tex.App. 126, 136 (1886) stating that terror means more than fright or alarm.

█ A person's intent may be shown by his acts and his words. We are mindful that Beckwith remained calm, never became hysterical, did not try to escape, had access to knives in the camper, did not attempt to attract passersby on I–10 West, did not call out to others at rest stops, and did not appear to be agitated or upset when the officers arrested appellant. The State offered medical evidence that such apparent calmness, along with sleepiness, may be evidence of withdrawal from a stressful situation. Although Beckwith did not appear to be terrorized outwardly when rescued, she repeated during the trial that she was afraid of the appellant, of what he might do to her. She told about recurring nightmares. It is generally known that not all persons react in the same manner to frightening events. We hold there was sufficient, albeit conflicting, evidence for a jury to find an intent by appellant to terrorize the victim. We overrule ground of error one.

█ In grounds of error two and three appellant challenges the constitutionality of TEX. PENAL CODE ANN. § 20.04, in that its provisions are vague as well as overbroad because the statute allows a first-degree felony conviction for conduct that is condemned as a second-degree felony, namely kidnapping, § 20.03. Restraint becomes abduction when it is done with intent to prevent the liberation of the victim. *Carpenter v. State,* 551 S.W.2d 724, 726 (Tex.Crim.App.1977). Appellant argues that persons of ordinary intelligence are not given adequate notice of the acts which would elevate the offense of kidnapping to aggravated kidnapping. Thus one might not know on which acts a jury relied in finding him guilty of aggravated kidnapping. This argument was rejected in *Phillips v. State,* 597 S.W.2d 929, 936 (Tex. Crim.App.1980). The Court stated that in order to be in a position to commit aggravated kidnapping, one must have committed kidnapping, which required a knowing or intentional abduction. The aggravating circumstances which raise the level of culpability must be the presence or absence of any one of the six specific intents at the time of the abduction. The ultimate issue is abduction with the requisite specific intent.

█ In the present case the specific intent to be proved was the intent to terrorize Beckwith. One's acts are generally reliable circumstantial evidence of his intent. *Id.; Bowers v. State,* 570 S.W.2d 929 (Tex. Crim.App.1978). Words and acts may be probative evidence of intent. We find no impermissible vagueness or uncertainty in the language of TEX. PENAL CODE ANN. § 20.04(a)(5). The statute prohibits abduction with intent to terrorize the victim or a third person. There is no statutory definition of the term "terrorize." Although a definition of the term "terrorize" was not given to the jury, we believe the jury could be presumed to apply the common and ordinary meaning. The statute in this case is not unconstitutionally vague.

█ Nor is it overbroad. A statute is overbroad when it sweeps within its reach constitutionally protected conduct. *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972). The statute would impose criminal liability for non-criminal conduct. In this case the jury must have found that appellant committed kidnapping, which requires an intentional or knowing abduction;

in addition the jury must then have found that appellant kidnapped Beckwith with the intent to terrorize. The kidnapping was completed when appellant took the complainant by threatened use of deadly force to his pickup truck; thereafter the words and acts of appellant could be considered by the jury to determine whether those words and acts demonstrated his intent to terrorize her. The aggravating element must be found to be present to raise the level of culpability to come within the prohibition of subsection 5 of the aggravated kidnapping statute. We believe this narrows, rather than broadens, the scope of that offense. We find the statute not to be constitutionally overbroad. Grounds of error two and three are overruled.

 We sustain ground of error four. We find that kidnapping, in the context of this case, was a lesser included offense of aggravated kidnapping. The lesser included offense of kidnapping was established by proof of less than all the facts required to establish the commission of the offense charged. TEX.CODE CRIM.PRO.ANN. art. 37.09(1) (Vernon 1981). *Phillips v. State, supra.* We can also apply the principles of *Royster v. State,* 622 S.W.2d 442, 446 (Tex.Crim.App.1981), that is, where there is testimony raising the issue that appellant, if guilty at all, is guilty only of the lesser included offense, to arrive at this decision. Although appellant did not testify, the testimony not only of the complainant, but also of the officers, raised that issue. *Compare, Bush v. State,* 358 S.W.2d 384, 385 (Tex.Crim.App.1962). We hold that the charge on kidnapping as a lesser included offense of aggravated kidnapping, applying the law to the facts of this case, should have been given to the jury when the appellant objected to its omission.

The judgment is reversed and the case remanded to the trial court.

DIÁL, Justice, dissenting.

I respectfully dissent.

I adopt the majority's possible definitions of "terrorize," i.e., fill with terror or anxiety, coerce by threat or violence, excite fear, rule by intimidation. The testimony of the complainant, as related in the majority opinion, was that the appellant did all of the above. The statute does not require continuous terrorizing, only that the abduction be with intent to terrorize. I find no conflicting evidence on appellant's intent to terrorize. In the absence of a *disputed* factual element, a charge on the lesser included offense is not required. *Royster v. State,* 622 S.W.2d 442 (Tex.Crim.App. 1981).

Before the court en banc.

## ON STATE'S MOTION FOR REHEARING

CADENA, Chief Justice.

The evidence is sufficient to sustain the conviction of aggravated kidnapping. The relevant evidence is set forth both in the original opinion by Justice Butts and the dissenting opinion by Justice Dial.

While it is true that the kidnapping statutes do not define the term "terrorize," however, TEX. PENAL CODE ANN. § 22.-07(a)(2) (Vernon 1974), which deals with "terroristic threats,"[1] includes in the category of terroristic threats a threat to commit any offense involving violence with the intent to place any person "in fear of imminent serious bodily injury." This statute affords ample support for the conclusion that appellant's threat to kill Beckwith if she attempted to escape constituted a threat to use deadly force which would reasonably create a feeling of terror in the mind of the threatened person. *See Rodriguez v. State,* 646 S.W.2d 524, 525–527 (Tex.App.—Houston [1st Dist.] 1982, no pet.).

The only disagreement on the Court concerning the proper disposition of this appeal concerns the failure of the trial court to grant appellant's charge on the lesser

---

1. The caption to the 1979 amendment of Article 22.07 states that it is an act relating to "the

offense of terroristic threats ...". Acts 1979, 66th Leg., ch. 530, p. 1113.

included offense of kidnapping. As pointed out in the opinion by Justice Butts, which is not withdrawn by this opinion, the evidence produced by the State is sufficient to raise the issue of whether appellant abducted Beckwith with the intent to terrorize her. Beckwith testified that no threats were made after the first afternoon of her ordeal, immediately following her abduction. After the first night, neither her hands nor feet were bound. She remained unfettered while appellant "fixed" the rupture of the vehicle's water hose. She sat on the tailgate of the vehicle, unfettered, while appellant helped another motorist make repairs to such other person's vehicle. She was allowed to go to the rest room unbound, and change her clothes. Appellant introduced her to others as his daughter, and there is no evidence that at such time appellant had any weapon on his person or nearby. At the roadside park where appellant was arrested, Beckwith, unfettered, climbed a fence for the purpose of "going to the rest room." Appellant did not accompany her. Other people were at the roadside park, and the evidence establishes that all weapons which might have been available to appellant were in the vehicle with Beckwith, not on his person.

Although appellant and Beckwith slept side by side two nights, he made no effort to molest her or touch her in any way, and there is no evidence that appellant had a weapon on his person while he was asleep. Appellant's statements concerning his intention to "show her off" to his friends and to buy her a house and a car constitute, together with all the evidence outlined in the preceding paragraph, a lack of intent to terrorize. The police who arrested appellant testified that Beckwith was quiet and subdued, although she was relieved by the fact that she had been rescued. There is no evidence of undue fright on Beckwith's part.

The motion for rehearing is overruled. The original opinion by Justice Butts stands as written, except that the second sentence in the second paragraph on page five of her opinion is deleted.

DIAL, Justice, dissenting.

This is an appeal from a conviction for aggravated kidnapping. After a jury found appellant guilty, the trial court found both enhancement allegations in the indictment to be true and assessed his punishment at life imprisonment.

The indictment in this case alleges, in pertinent part:

... on or about the 13th day of August, 1980, CHARLES EDWARD PADGETT did then and there intentionally and knowingly abduct TRACY L. BECKWITH, by THREATENING TO USE AND USING DEADLY FORCE with intent to TERRORIZE THE SAID TRACY L. BECKWITH; ...

The complainant was a 17-year-old who worked on the date of the offense at a Steak 'n Eggs restaurant on Harry Wurzbach Road in San Antonio. It was customary for one waitress to be the only employee on duty at that time of day, which was about 3:00 p.m. A couple left the restaurant, leaving only the appellant present. A neighborhood ranger patrolman came in, drank a cup of coffee, and left. Appellant then asked Beckwith to "watch his table" while he went outside for a moment. After agreeing to this, the complainant went to the restroom. When she later stepped out of the restroom, appellant seized her by the arm and pressed a gun against her lower back. She believed the gun to be a .45 caliber; it later proved to be a heavy pellet gun. She testified: Then he proceeded to threaten me, tell me that "I had better cooperate and if I didn't, he would blow my brains out" and there was various bad language. When asked about the "various bad language" she replied that "in all my statements I left the vulgar out." She recalled that he said, instead of "blow my brains out," the words were, "I'm going to blow your shit away." She was wearing a white uniform with an apron. He ordered her to remove the apron and leave it on the floor. Appellant also told her to leave her purse at the restaurant. He then walked her over to the cash register and told her to

get the money, still with the gun against her back. She removed the bills only, less than $40.00, and he then put the gun in his waistband, placed his arm about her, and they walked out the door and went to the back parking lot.

Appellant put her in the front seat of his pickup, which had a Coleman camper on it, ordering her to put her head "down between my legs." She said she complied because she was afraid he might hurt her or shoot her. She also stated he had a conversation with "two black men" in another vehicle away from the pickup at the time, but she did not see them. She said the other two men wanted appellant to give her to them, but he refused. The patrolman testified otherwise, stating there had been no other vehicles on the parking lot when he was there.

Appellant drove the truck away, and, she stated, he repeatedly told her he would "drop" her off soon. He advised that they were driving through the Post (Fort Sam Houston), but she did not raise her head. She was perspiring and he told her to wipe her face with a towel, "and I being stubborn, I didn't want to ... I just didn't want to bother to look up or anything, and so finally he pulled my head up [by her hair] and smacked me with his back hand ... and jabbed me in the side with a gun, telling me I had better do what he said." She said she was afraid of him and wondered what he might do to her.

Appellant drove to Raymond Russell Park off Interstate 10 West. She said he put her in the camper and tied her hands with an electrical cord, her feet with cord from a hair blow dryer, and placed a handkerchief gag on her mouth. She stated there was no one around, although the defense pointed out this was summertime and a popular park. She said she did not attempt to cry out. She testified she threw the money (bills) at him in the cab while her head was down because she was "mad." They left Raymond Russell Park while it was still daylight and went to a service station. She did not attempt to call out because he had told her to be quiet or he

would kill her and the attendant. She said she believed him.

They continued on I–10 West until they came to a roadside park with facilities. She had gone to sleep. When he was not in the cab, he "was always sitting in the back talking to her," she said, about his old war days, ripping off places like Tiffany's, girls he had taken, then raped, and it "turned into some big party" because the girls enjoyed it, people he had killed, taking girls and selling them. She said she did not believe all his stories.

He untied her feet when they arrived at the "comfort station," and took off the mouth gag, leaving her hands tied. She went to sleep before he did and awoke after he did on the two nights she was with him. She related he lay by her each night, on the camper floor, but did not attempt to have sexual relations with her nor to contact her sexually. He wanted her to call him "daddy," and he told her he was going to buy her a car, a house and a dog, and take her out and "show her off" to all his friends. He told a family at a rest stop she was his daughter.

The next morning they continued on to Ozona and stopped at a rest stop on a cliff [near Sheffield]. The water hose "broke," and while he repaired that, appellant untied Beckwith's hands. He had not threatened her anymore, she said, after the first day. She remained untied after that. She was going to try to escape, she said, on the second night, but she fell asleep again. When she woke the next morning, appellant was helping a trucker with truck repairs at the rest stop. She sat on the tailgate of the pickup. She and appellant were sitting later at a picnic table when the officers arrested appellant. [This was for an unrelated offense, and the officers had a warrant and a description of his truck]. The testimony of an officer showed that other people were at the rest stop when they arrived.

Beckwith admitted on cross-examination that she had "gone to the restroom" away from appellant and that she had changed her clothes. Further, she said she was

alone much of the time in the camper and there were windows, but that she did not attempt to alert anyone that she was a captive. They went to a store and he bought snack food while she remained in the camper without a gag on her mouth the first evening. He untied her feet when they returned from the store. He permitted her to go to the restroom at the first comfort station. She stated she saw two knives in the camper and she knew their location in the camper. The arresting policemen found three knives in the camper. At the last rest stop, which had no facilities, appellant let her climb a fence to go to the "restroom". The appellant did not testify nor offer other testimony.

*Kidnapping,* TEX. PENAL CODE ANN. § 20.03 (Vernon 1974) is the offense committed when a person intentionally or knowingly abducts another, and the jury charge so defined it in this case. The charge defined "abduct" by tracking the instant indictment and the statute.

*Abduct,* § 20.01 of the penal code, means to restrain a person with intent to prevent his liberation by:

\* \* \* \* \* \*

(B) using or threatening to use deadly force.

It further defined *restrain* as restricting a person's movements, so as to interfere substantially with his or her liberty, by moving him or her from one place to another or by confining him or her. § 20.01(1).

*Deadly force* was defined for the jury as force that is intended or known by the person acting to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 9.01(3) (Vernon 1974).

Therefore, in the present case, the jury must initially find that the appellant intentionally or knowingly restrained Beckwith with intent to prevent her liberation by using or threatening to use deadly force [abduction]. These are the required elements of kidnapping. In order to elevate the offense to aggravated kidnapping the jury next must find that the kidnapping

was committed *with intent to terrorize Beckwith,* § 20.04(a)(5), and the trial court so charged.

The term "terrorize" was not defined in the jury charge. A search of Texas cases reveals no definition nor, as yet, any conviction which rests upon subsection 5 of the aggravated kidnapping statute. We have drawn upon another source to guide us since appellant's first ground of error attacks the sufficiency of the evidence to sustain a finding of appellant's specific intent to terrorize Beckwith.

Webster's Third New International Dictionary (1981), casts some light upon the meaning of "terrorize": It may mean to fill with terror or anxiety; or to coerce by threat or violence. Perhaps, to excite fear; or to rule by intimidation. *Id.* at 2361. "Terrorism" may be the systematic use of terror as a means of coercion. It may create an atmosphere of threat or violence. *Id.* at 2361. Terror may denote stark fear; a state of intense fright or apprehension. *Id.* at 2361. Terrorize, as distinct from terrify, often implies an intentional affecting with terror. *Id.* at 912 (frighten). *See also Arto v. State,* 19 Tex.App. 126, 136 (1885) stating that terror means more than fright or alarm.

A person's intent may be shown by his acts and his words. There was sufficient evidence for a jury to find an intent by appellant to terrorize the victim.

Appellant challenges the constitutionality of TEX. PENAL CODE ANN. § 20.04, in that its provisions are vague as well as overbroad because the statute allows a first-degree felony conviction for conduct that is condemned as a second-degree felony, namely kidnapping, § 20.03. Restraint becomes abduction when it is done with intent to prevent the liberation of the victim. *Carpenter v. State,* 551 S.W.2d 724, 726 (Tex.Crim.App.1977). Appellant argues that persons of ordinary intelligence are not given adequate notice of the acts which would elevate the offense of kidnapping to aggravated kidnapping. Thus one might not know on which acts a jury relied

in finding him guilty of aggravated kidnapping. This argument was rejected in *Phillips v. State*, 597 S.W.2d 929, 936 (Tex. Crim.App.1980). The court stated that in order to be in a position to commit aggravated kidnapping, one must have committed kidnapping, which required a knowing or intentional abduction. The aggravating circumstances which raise the level of culpability must be the presence of any one of the six specific intents at the time of the abduction. The ultimate issue is abduction with the requisite specific intent.

In the present case the specific intent to be proved was the intent to terrorize Beckwith. One's acts are generally reliable circumstantial evidence of his intent. *Id.; Bowers v. State*, 570 S.W.2d 929, 933 (Tex. Crim.App.1978). Words and acts may be probative evidence of intent. There is no impermissible vagueness or uncertainty in the language of TEX. PENAL CODE ANN. § 20.04(a)(5). The statute prohibits abduction with intent to terrorize the victim or a third person. There is no statutory definition of the term "terrorize." Although a definition of the term "terrorize" was not given to the jury, we believe the jury could be presumed to apply the common and ordinary meaning. The statute in this case is not unconstitutionally vague. Nor is it overbroad. A statute is overbroad when it sweeps within its reach constitutionally protected conduct. *Grayned v. City of Rockford*, 408 U.S. 104, 114–15, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972). Additionally, an overbroad statute would impose criminal liability for non-criminal conduct. *Id.* In this case the jury must have found that appellant committed kidnapping, which requires an intentional or knowing abduction; in addition the jury must then have found that appellant kidnapped Beckwith with the intent to terrorize. The kidnapping was completed when appellant took the complainant by threatened use of deadly force to his pickup truck; thereafter the words and acts of appellant could be considered by the jury to determine whether those words and acts demonstrated his intent to terrorize her. The aggravating element must be found to be present to raise the level of culpability to come within the prohibition of subsection 5 of the aggravated kidnapping statute. We believe this narrows, rather than broadens, the scope of that offense. The statute is not constitutionally overbroad.

Appellant also complains of the trial court's failure to charge on the lesser included offense of kidnapping. To warrant submission of the lesser included offense there must have been conflicting evidence on whether or not the kidnapping was done with intent to terrorize the complainant. As stated above, "terrorize" means to fill with terror or anxiety, coerce by threat or violence, excite fear, rule by intimidation. The testimony of the complainant was that the appellant did all of the above. The statute does not require continuous terrorizing, only that the abduction be with intent to terrorize. There is no conflicting evidence on appellant's intent to terrorize. In the absence of a *disputed* factual element, a charge on the lesser included offense is not required. *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981).

I would grant the motion for rehearing and affirm the judgment.