John NASH, et al., Plaintiffs,

v.

The STATE OF TEXAS, et al., Defendants.

Civ. A. Nos. TY–79–73–CA, TY–79–98–CA.

United States District Court, E.D. Texas, Tyler Division.

Feb. 21, 1986.

Larry R. Daves, Daves, McCabe & Crews, Tyler, Tex., and George E. Barrett, Nashville, Tenn., for plaintiffs.

David R. Richards, Austin, Tex., and Edward B. Cloutman, III (also for Mullinax, Wells, et al, Intervenors), Dallas, Tex., for Local 746, United Rubber Workers.

Erich F. Klein, Jr., Dallas, Tex., for Delbert Chandler and Buddy Schoellkopf Products, Inc.

Charles H. Clark, Tyler, Tex., for Delbert Chandler and Buddy Schoellkopf Products, Inc., City of Tyler.

Cameron McKinney, Tyler, Tex., for City of Tyler, Tex., and Willie Hardy, Chief of Police.

Mary Keller, Asst. Atty. Gen., Austin, Tex., for State of Texas.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

This civil action presents the issue of whether two sections of the Texas mass picketing statute [1] abridge plaintiffs' right to freedom of expression under the First Amendment.[2]

---

1. Tex.Rev.Civ.Stat.Ann. art. 5154d (Vernon 1971) states:

**Art. 5154d. Picketing**

Section 1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activity that shall constitute mass picketing as herein defined.

"Mass picketing," as that term is used herein, shall mean any form of picketing in which:

1. There are more than two (2) pickets at any time within either fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets.

2. Pickets constitute or form any character of obstacle to the free ingress to and egress from any entrance to any premises being picketed or to any other premises, either by obstructing said free ingress or egress by their persons or by the placing of vehicles or other physical obstructions.

The term "picket," as used in this Act, shall include any person stationed by or acting for and in behalf of any organization for the purpose of inducing, or attempting to induce, anyone not to enter the premises in question or to observe the premises so as to ascertain who enters or patronizes the same, or who by any means follows employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed.

The term "picketing," as used in this Act, shall include the stationing or posting of one's person or of others for and in behalf of any organization to induce anyone not to enter the premises in question, or to observe the premises so as to ascertain who enters or patronizes the same, or to follow employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed.

Sec. 2. It shall be unlawful for any person, singly or in concert with others, by use of insulting, threatening or obscene language, to interfere with, hinder, obstruct, or intimidate, or seek to interfere with, hinder, obstruct, or intimidate, another in the exercise of his lawful right to work, or to enter upon the performance of any lawful vocation, or from freely entering or leaving any premises.

Sec. 5. Any person guilty of violating any of the Sections of this Act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than Twenty-five Dollars ($25) nor more than Five Hundred Dollars ($500), or be imprisoned in jail not to exceed ninety (90) days, or both. Each separate act of violation shall constitute a separate offense. . . . .

Acts 1947, 50th Leg., p. 239, ch. 138.

2. The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech ... or of the right of people peaceably to assemble...." First Amendment freedoms are protected from invasion by the states by the Fourteenth Amendment. *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

## I. FACTS

In September 1978, Buddy Schoellkopf, Inc. ("Schoellkopf Products" or "the company"), maintained a plant in Tyler, Texas, where it manufactured marine safety equipment and down-filled hunting clothes. Many of the events giving rise to this action occurred near the plant. It is located on Gentry Parkway, a main thoroughfare, which consists of six lanes of traffic and measures 150 feet in width. Two access roads lead to the plant from Gentry Parkway, each of which is about twenty-seven feet wide.

On September 18, 1978, the National Labor Relations Board certified Local 746 of the United Rubber Workers ("the union") as the collective bargaining representative of an appropriate unit of employees at the Schoellkopf Products plant in Tyler. Management personnel at Schoellkopf Products were disquieted by the union's presence at the plant, and seemingly felt that the presence of the police might be needed, because of union activities. Accordingly, company representatives and agents called on Willie Hardy, then the Assistant Chief of Police of Tyler, in order to "get to know" officials of the Tyler Police Department. The plant manager, Jeff Keasler, again met with Hardy (by then Chief of Police) and Charles Clark, Esquire, his attorney, in late January 1979, for lunch at a country club in Tyler, ostensibly to discuss security at the company's plant.

During the period from September 1978, to February 8, 1979, the union bargained with Schoellkopf Products, without any disruption of work at the company's Tyler plant. On February 8, 1979, the union began engaging in protected concerted activity, in the form of a strike, against the company. Picket lines were thereafter established at the entrance to the company's plant in Tyler. Members of the union at Schoellkopf Products' Tyler plant were mostly women. Thus, picketing at the plant site was primarily conducted by striking women employees of the company, from the inception of the strike on February 8, 1979, to March 12, 1979.

The company employed the services of Century Security Company, as a security force, prior to the beginning of the labor dispute. This service provided three armed guards, led by one Herbert Thompson. Each guard was issued one or more firearms, including pistols, shotguns, and rifles. At the picketing site, Thompson possessed a .357 caliber magnum revolver, worn as a sidearm. In his automobile, stationed nearby, he kept a 12 gauge shotgun, a .30 caliber carbine with a 20-shot clip, and an AR–15 automatic rifle, all of which were loaded. At times, security personnel pointed the weapons in the direction of pickets. Security guard Thompson frequently taunted picketers by threats of violence. Additionally, he made crude, explicit, and unwelcome sexual overtures to some female pickets.

Apparently in response to the tactics employed by the company's security force, a large number of the union's members, mostly male, from the Kelly-Springfield Tire Company plant in Tyler, joined in the picketing at the Schoellkopf Products' plant on March 12, 1979. In several instances during that day and the following two days, non-striking employees were delayed for short periods in entering and leaving the company's plant, when pickets temporarily blocked the access roads leading from Gentry Parkway to the plant. On these occasions, picketers taunted and jeered at non-striking employees, often using obscene and abusive language and gestures, as well as making a few intermittent threats of violence. The strikers, in turn, were reviled and scoffed at by the non-strikers, who also uttered obscenities and threats. In addition, pickets broke off several radio antennas on automobiles occupied by non-strikers, and they flailed a small number of the non-strikers' vehicles with picket signs and with their hands. On one occasion during the three day interval, the president of Local 746, John Nash, apparently provoked by his perception that plant guards were making unnecessary and threatening displays of their weapons, ap-

peared on the picket line with a shotgun. At the instance of the company, he was promptly arrested by the police. Aside from these incidents, no actual force or significant threats of force occurred during the entire course of the strike.

In the period from February 8, 1979, to March 14, 1979, the Tyler Police Department had sent police officers to the location of the picketing at Schoellkopf Products' plant only in response to specific complaints from company representatives. During that interval, five arrests were made by the police force at the scene of the picketing, none of them concerning alleged violation of the mass picketing statute. On at least one occasion, on February 12, 1979, police officers "advised that as long as strikers were moving, no action could be taken by officers."

On March 14, 1979, the company filed a suit in a state court against the union, John Nash, and another union member, seeking a temporary restraining order, a temporary injunction, and a permanent injunction against the union's picketing activities.[3] A temporary restraining order was granted, *ex parte*, by the Honorable Galloway Calhoun, Judge of the 114th Judicial District of Texas, on March 14, 1979, restraining picketing and other alleged activities of the union and Local 746.[4]

On March 15, 1979, the company's president, Hugo Schoellkopf, arranged for a meeting to be held in the office of the City Manager of Tyler, Texas, at 11:00 o'clock a.m. Schoellkopf, executive vice-president Delbert Chandler, plant manager Jeff Keasler, and company attorney Erich Klein represented the company. Also present were City Manager Ed Wagoner, Assistant City Manager Terry Childress, Chief of Police Willie Hardy, and the executive director of the Tyler Chamber of Commerce, Freeman Carney. Neither the City Attorney, State District Attorney, nor any union representative was invited to attend this meeting. According to Schoellkopf, the purpose of the meeting was to insure that the City of Tyler and its Police Chief would enforce the mass picketing statute at the company's Tyler plant. At the gathering, copies of the statute were made available to the city officials by the company representatives.

Later on March 15, 1979, at 2:15 o'clock p.m., Hardy met with Chandler and Nash. In the ensuing discussion, Hardy stated that the police would be present at the picketing situs and would enforce the mass picketing statute. He further explained

---

3. That action, styled *Buddy Schoellkopf Products, Inc. v. United Rubber Workers, Local 746, United Rubber Workers of America, John Nash and John Dawson*, No. 79–446, filed in the District Court of Smith County, 114th Judicial District of Texas, was subsequently removed to this court and consolidated with the instant action, which was filed by the union.

4. A review of state appellate court decisions concerning labor disputes leads ineluctably to the conclusion that in Texas, as elsewhere, concerted activity by unions frequently leads to bitter, acrimonious, and sometimes violent confrontations, not only with management, but also with city, county, or state law enforcement personnel, or various combinations of them. Often, as happened here, an *ex parte* temporary restraining order has been granted by a state judge. Such *ex parte* proceedings historically have been misused in labor controversies. *See* F. Frankfurter & N. Green, *The Labor Injunction*, 60, 64 (1930). The temporary restraining order does not preserve the *status quo.* "The suspension of activities affects only the strikers;

the employer resumes his efforts to defeat the strike, and resumes them free from the interdicted interference." *Id.* at 201.

The effectiveness of concerted activity is largely a matter of timing, and once it is interrupted by a temporary restraining order, resumption may be impossible or fruitless. The voiding of the order or the release of jailed pickets will not compensate for the loss of momentum. In many instances, then, the labor dispute is, in effect, settled by the issuance of such an order. *Construction Laborers v. Curry*, 371 U.S. 542, 550, 83 S.Ct. 531, 536, 9 L.Ed.2d 514 (1963). *See* Broomfield, *Pre-emptive Federal Jurisdiction Over Concerted Trespassory Union Activity*, 83 Harv.L.Rev. 552, 566, 569 (1970); Michaelman, *State Power to Govern Concerted Employee Activities*, 74 Harv.L.Rev. 641, 649 (1961).

While the stringent measures employed by the police in enforcing the temporary restraining order in issue here did not completely stop the strike, it undeniably quelled much of the dynamism previously evident in the union's strike activities.

that the pickets would be allowed to cross the company driveway, if traffic at the entrance to the plant was not blocked for more than one minute. Nash was not advised by Hardy of the 11:00 o'clock a.m. meeting earlier that day with officials of the company, the City of Tyler, and the Chamber of Commerce.

After the temporary restraining order was granted by the state court on March 14, 1979, Nash and a representative of the Tyler Police Department, together, marked off a distance of fifty feet from each entrance to the defendant company's plant. Thereafter, all pickets, strikers, and their sympathizers were required by the police to stay behind the fifty-foot markers.

After March 15, 1979, the Tyler Police Department followed a standard procedure. At approximately 4:15 p.m., fifteen minutes before production workers at the company's plant stopped work for the day, four to six vehicles of the Tyler Police Department, including a "paddy wagon," were stationed along the curb on both sides of the entrance driveway to the plant. From six to twelve members of the Police Department posted themselves in the vicinity of the picket line. Pickets, other striking employees, and their sympathizers were thereafter arrested by the police, for perceived violations of the mass picketing statute.

From March 15, 1979, to March 28, 1979, approximately ninety arrests were made for "unlawful picketing." In arresting the picketers, the police cited three alleged violations of the mass picketing statute, Article 5154d, as follows:

1. Under the "numbers-distance" provision, § 1, paragraph 1, anyone who approached the two picketers within fifty-foot markers laid out by police and union members was arrested, even

a person intending to relieve a picketer on duty;

2. A picketer who caused a vehicle driven on the access and exit roads to the plant to stop, even momentarily, was arrested, allegedly pursuant to § 1, paragraph 2;[5] and

3. Any striker or sympathizer who shouted "scab"[6] or who was accused of uttering a profanity was arrested, supposedly in accordance with § 2 of the statute.

No arrests were made for alleged acts or threats of violence, destruction of property, or resisting arrest.

The arrests of the union's attorneys were particularly notable. Ken Miller, Esquire, and Joe Beam, Esquire, counsel for Local 746, approached the picket line on March 15, 1979, at about 4:30 o'clock in the afternoon. Each identified himself to the police as an attorney for the picketing union members. Without regard to these facts, the Tyler police officers on the scene arrested each attorney for unlawful picketing, handcuffed both, and placed them, first, in the police paddy wagon and, later, in a patrol car. The two attorneys were afterwards taken to jail, booked, and processed. They were ultimately released on bail near midnight on March 15, 1979. On March 20, 1979, Beam and Michael Hubband, Esquire, another union attorney, visited the picket line, to speak to the sole picket on the scene. When they approached the picket, both of the attorneys were arrested for unlawful picketing and handcuffed, over their protests that they were attorneys for the union. The picket was also arrested. All three were taken to jail, booked, and released hours later on bail. The only persons placed in handcuffs incidental to the mass picketing arrests were the union attorneys.

---

5. These arrests were in disregard of Hardy's earlier "one minute" pronouncement. The evidence showed that a person who walked deliberately and uninterruptedly could cross an access road in ten to twelve seconds.

6. See *Letter Carriers v. Austin,* 418 U.S. 264, 282–83, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1974); *Linn v. United Plant Guard Workers,* 383 U.S. 53, 60–61, 86 S.Ct. 657, 661–62, 15 L.Ed.2d 582 (1966).

No formal complaints [7] were filed in connection with any of these arrests until after the subsequent hearing on plaintiffs' motion for a preliminary injunction in the instant litigation, which was begun twelve days after the first arrests.

Immediately before the mass arrests began, John Nash filed a complaint in United States District Court for the Eastern District of Texas, seeking damages, as well as declaratory and injunctive relief, against the company, its officers, and City of Tyler officials. His complaint, based on 42 U.S.C. § 1983, alleged, *inter alia,* that the defendants had unlawfully conspired to deprive him of his individual right to be free from unlawful arrest and imprisonment. On March 21, 1979, after the mass arrests had begun, a first amended complaint was filed by Nash, together with the union and its attorneys, Ken T. Miller, Joe B. Beam, and Michael W. Hubbard. There, the plaintiffs alleged that, through the illegal enforcement of the mass picketing statute, the defendants were interfering with their First Amendment rights. They further maintained that the enforcement of Article 5154d (which had been declared unconstitutional by a federal district court in 1972),[8] additionally violated their rights under (1) the Fourteenth Amendment to the United States Constitution, (2) §§ 7 and 13 of the National Labor Relations Act, 42 U.S.C. § 141, *et seq.,* and (3) 42 U.S.C. §§ 1983 and 1985. In the amended complaint, the union sought a temporary restraining order from this court, which was denied on March 22, 1979, after an in-chambers hearing, because the issues required the taking of evidence. On April 4, 1979, after an evidentiary hearing, a preliminary injunction issued, enjoining the city officials and police from arresting those union members who shouted "scab" at non-strikers, those who slowed traffic on the plant access roads only momentarily, and those who approached the picket line to relieve other workers. The injunction also prohibited the arrest of attorneys who approached the picketers to consult with them. Finally, city officials were required to control traffic at the plant, so as to ensure the safety of the picketers.[9] The preliminary injunc-

---

7. Upon the arrest of a picketer, anomalous procedures, not authorized by statute, were employed by the city magistrate. The magistrate issued an "Order Setting Bond and First Court Appearance," which conclusorily charged the arrested person with "unlawful picketing," and required his or her appearance in the County Court at Law of Smith County. The order also provided: *"If you are charged* with a misdemeanor, you will be arraigned at the above time."* Affidavit in Support of Motion for Preliminary Injunction, March 30, 1979, at 3 (emphasis added). Under Texas law, a formal complaint must be under oath and allege the elements of the offense. Tex.Crim.Proc.Code Ann. art. 15.05 (Vernon 1977). In a County Court, prosecution must be by information, supported by a sworn complaint. *Id.* art. 21.22. A careful review of the record in this action indicates that no criminal prosecutions are presently pending in the state court, as a result of these arrests.

8. For an explanation of this case, *Medrano v. Allee,* 347 F.Supp. 605 (S.D.Tex.1972), *see infra* pp. 963–64.

9. Specifically, city officials and police were enjoined from:

(1) arresting, impeding, or harassing any picket, union member, or sympathizer for addressing the term "scab" to non-striking employees of defendant Buddy Schoellkopf Products, Inc.;

(2) arresting, impeding, or harassing any picket for alleged obstruction of any access road to the Tyler, Texas, facility of defendant Buddy Schoellkopf Products, Inc., if such picket momentarily cause[d] a vehicle or vehicles to stop by walking in front of such vehicle or vehicles, provided that such picket proceed[ed] at a deliberate, uninterrupted pace by the most direct, practicable route across such road, and [took] no longer than twelve seconds to traverse it;

(3) failing to control vehicular traffic entering or leaving the Tyler, Texas, premises of defendant Buddy Schoellkopf Products, Inc., in such a manner as to insure the safety of pickets crossing the access roads to such premises;

(4) arresting, impeding, or harassing any picket proceeding to the picket line at the Tyler, Texas, facility to defendant Buddy Schoellkopf Products, Inc., to relieve another picket;

(5) arresting, impeding, or harassing any attorney for union officials, union members, or their sympathizers, when such attorney desire[d] to consult with his clients at the picketing site at the Tyler, Texas, facility of Buddy Schoellkopf Products, Inc.

tion was appealed to the Court of Appeals for the Fifth Circuit; but it was dismissed on May 30, 1980, because the strike had ended and the union had been decertified as the collective bargaining agent for the employees of Schoellkopf Products.

By subsequent order, the following actions were taken in this action: (1) leave was granted to the striking employees to intervene individually; (2) pursuant to 28 U.S.C. § 2281 (since repealed), the Attorney General of Texas was notified that the constitutionality of Article 5154d had been challenged; (3) leave was granted to the State of Texas to intervene; (4) plaintiffs' claim for injunctive relief was dismissed; (5) plaintiffs' claim for declaratory judgment concerning the constitutionality of § 1, paragraph 2, of Article 5154d was dismissed; [10] (6) the claims against all private parties-defendants were dismissed; (7) the claims for damages of two named plaintiffs were severed in conformity with FED. R.CIV.P. 21; [11] and (8) all other damage claims were dismissed. Thus, the remaining parties in this action are Nash and the union, as plaintiffs, and the Chief of Police of the City of Tyler, the City of Tyler, and the State of Texas, as defendants.

The plaintiffs seek declaratory relief that § 1, paragraph 1, and § 2 of Article 5154d unconstitutionally infringe on their First Amendment rights. But before addressing the constitutionality of the statute, it must be determined whether the issue has been rendered moot by the decertification of the union and the termination of the strike.

## II. MOOTNESS

■ Mootness becomes an issue when the actions which provoked the suit have ended or been settled. Defendants argue that this action is moot, because the strike against Schoellkopf Products has ended,

the union has been decertified, and the claims for injunctive relief have been dismissed. The Supreme Court has held that a case is moot, if events have caused it to lose "its character as a present, live controversy." *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1968). When developments render a controversy moot, a court's jurisdiction is destroyed, for jurisdiction under Article III of the Constitution is limited to actual cases and controversies. *Sosna v. Iowa*, 419 U.S. 393, 398–403, 95 S.Ct. 553, 556–59, 42 L.Ed.2d 532 (1979); *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). Accordingly, the first issue to be addressed is whether, even though the strike has ended, there remains " 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969) (quoting *Maryland Casualty v. Pacific Coal & Oil*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

■ An exception to the mootness doctrine exists, if the conduct is capable of repetition, yet evades review. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see also Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *Sosna*, 419 U.S. at 399–400, 95 S.Ct. at 557; and *Super Tire Engineering Company v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). To be preserved for review, the challenged conduct must meet two criteria: (1) a reasonable expectation must obtain that the aggrieved party will again be subjected to the same behavior; and (2) the questioned actions must be

Preliminary Injunction, Civil Action No. 79–73–CA, April 4, 1979.

**10.** This action was taken at the behest of the company, but was not opposed by the union, the latter apparently regarding the decision of the Court of Criminal Appeals of the State of Texas in *Sherman v. State,* 626 S.W.2d 520 (Tex.Crim.

App.1981), as favorable to the union, in relation to this issue. The prosecution in *Sherman* arose from the labor dispute in question.

**11.** The action for damages by these two named plaintiffs was later dismissed, for want of prosecution.

too brief to be litigated fully prior to their cessation. *First National Bank v. Bellotti*, 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978); *United Steelworkers of America v. Bishop*, 598 F.2d 408, 412 (5th Cir.1979). In analyzing whether these two essentials are present, courts must consider the nature of the dispute, the future relationship of the parties, the likelihood of a recurrence of the action, and the type of relief sought. These considerations sometimes overlap, as here.

### A. Nature of the Dispute

Litigation that results from a labor strike is often deemed justiciable, even though the strike has terminated. By their nature, economic strikes are often brief, and hence conflicts emerging from them "evade review." *See Super Tire Engineering Company v. McCorkle*, 416 U.S. at 125, 94 S.Ct. at 1699; *American Commercial Barge Line Co. v. Seafarers Int'l. Union*, 730 F.2d 327, 332–33 (5th Cir.1984); *Florida Board of Business Regulation v. N.L.R.B.*, 605 F.2d 916, 920 (5th Cir.1979); *Bishop*, 598 F.2d at 412. It has been frequently held, therefore, that regulations of picketing, including the actions of the picketers, management, and law enforcement officials, remain within judicial purview, although the circumstances leading to the enforcement of the regulations or causing the challenged actions have ended. *See, e.g., McCorkle*, 416 U.S. 115, 94 S.Ct. 1694; *Bishop*, 598 F.2d 408. Otherwise, the propriety of the regulations and conduct in issue could totally escape judicial review.

### B. Relationship of the Parties

The Supreme Court emphasizes the importance of the "ongoing collective rela-

tionship" of the parties in *Super Tire Engineering Company v. McCorkle*, 416 U.S. at 124, 94 S.Ct. at 1699.[12] In *McCorkle*, employers challenged New Jersey's policy of awarding public assistance to striking employees through a state welfare program. In seeking declaratory and injunctive relief, the employers claimed that the regulations granting benefits to striking workers interfered with the federal labor policy of free collective bargaining, embodied in the Labor-Management Relations Act, 29 U.S.C. § 141 et seq. Before the case was tried, the strike ended. Rejecting arguments that the case was moot, the district court tried the action and dismissed the employers' claim. To the extent that declaratory relief was sought, the Supreme Court upheld the right of the district court to hear the action, reasoning that the state policy of awarding unemployment benefits continued to affect "the collective-bargaining relationship, both in the context of a live labor dispute while a collective bargaining agreement was being formed, *and* in the ongoing collective relationship...." *Ibid.* (emphasis in original).

■ While the decertification of the union at Schoellkopf Products arguably has severed any "ongoing collective relationship" between the parties in this case, a careful analysis disproves that contention. First, the union may again seek to organize at Schoellkopf Products, and the statute could be reinvoked in the same manner. Second, the statute will directly affect any "ongoing collective relationship" between the union and other companies, as well as directly influence the future conjoint dealings of the union and the police in unrelated labor disputes. Third, assuming no

**12.** Courts consistently use *McCorkle*'s analysis to assess a statute's current impact on the parties' relative bargaining positions in labor disputes. Repeatedly, courts have found the possibility of further conflicts between labor and management makes a case justiciable. *See, e.g., Fire-Fighters' Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (possibility of lay-offs in future rendered dispute between city and employees subsistent); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 300, 99 S.Ct. 2301, 2309, 60

L.Ed.2d 895 (1979) (Arizona statute regulating union elections imposed existent burden, even though there had been no union elections since statute's enactment); *Florida Board of Business Regulation v. National Labor Relations Board*, 605 F.2d 916, 919 (5th Cir.1979) ("adversity of interests" survives despite union's defeat in election). *See also Peyote Way Church of God, Inc. v. Smith*, 742 F.2d 193, 199 (5th Cir.1984); *Terry v. Penn Central Corp.*, 668 F.2d 188, 190 (3rd Cir.1981).

"ongoing collective relationship" exists, the dissolution of that relationship was accomplished through the speedy and effective use of the statute. To allow the defendants to suppress a strike by employment of the statute, and then permit them to prevail with an argument that their swift success precludes review of the enactment would be contrary to sound judicial administration.[13] Finally, the fear of arrest by the police will likely exert an *in terrorem* effect upon future strikers, making them unwilling to participate in picketing activities. Since picketing is a potent economic weapon for employees in strike situations, its absence will operate to diminish the union's bargaining power.[14]

### C. Likelihood of Recurrence

■ In order for the action to be justiciable, a reasonable expectation must exist that the aggrieved party will be subject to the same conduct in the future. *First National Bank v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978). Threats of prosecution under the statute should be neither "imaginary" nor "speculative." *Steffel v. Thompson,* 415 U.S. 452, 458–60, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974). Instead, the statute must have a "continuing and brooding presence" that affects future actions. *McCorkle,* 416 U.S. at 122, 94 S.Ct. at 1698. *See Fire Fighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 2583, 81 L.Ed.2d 483 (1984) (compliance with injunction, whose interpretation was unchallenged, required in any future layoffs). A party need not expose himself to actual arrest or prosecution in order to make a constitutional challenge.[15]

■ Like the New Jersey unemployment benefits statute in *McCorkle* and the injunction in *Stotts,*[16] Article 5154d remains available for future use. The defendants have made clear that they would invoke the statute again in a similar picketing situation; hence, threats of prosecution are substantial and are not "imaginary" or "speculative." The bipartite test for the likelihood of recurrence has thus been met; that is, (1) the time necessary to suppress a strike by use of the disputed statute is far briefer than that necessary to litigate a claim challenging the statute itself; and (2) a "reasonable expectation" is present that the plaintiff union will desire to picket again, and that the Tyler police will enforce the anti-picketing statute in the same manner. *See McCorkle,* 416 U.S. at 122, 94 S.Ct. at 1698.

### D. Type of Relief Sought

Finally, the plaintiffs seek only declaratory relief in this action. The Supreme

---

13. *Cf. Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980); *National Labor Relations Board v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *White v. Matthews,* 559 F.2d 852, 857 (2nd Cir.1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

14. "Picketing has traditionally been a major weapon to implement the goals of a strike." *Steelworkers v. National Labor Relations Board,* 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964). "[T]he public interest is served by freedom of labor to use the weapon of picketing." *Garner v. Teamsters,* 346 U.S. 485, 500, 74 S.Ct. 161, 171, 98 L.Ed. 228 (1953). *See also Railway Trainmen v. Terminal Company,* 394 U.S. 369, 386, 89 S.Ct. 1109, 1119, 22 L.Ed.2d 344 (1969).

15. *See Medrano v. Allee,* 416 U.S. 802, 810, 94 S.Ct. 2191, 2197, 40 L.Ed.2d 566 (1974): "There can be no requirement that appellees continue to subject themselves to physical violence and unlawful restrictions upon their liberties throughout the pendency of the action in order to preserve it as a live controversy." *See also Steffel,* 415 U.S. at 459, 94 S.Ct. at 1215; *Gray v. Sanders,* 372 U.S. 368, 376, 83 S.Ct. 801, 806, 9 L.Ed.2d 821 (1963); *Peyote Way Church of God v. Smith,* 742 F.2d 193 (5th Cir.1984).

16. The *McCorkle* emphasis on an ongoing collective relationship mirrors the concern of the "continuing effect" of the district court injunction on the relationships of the parties in *Stotts,* 104 S.Ct. at 2584. Under Justice O'Connor's reasoning in *Stotts,* "collateral effects of a dispute remain," *i.e.,* the future labor relations of the union with the Tyler police, as well as the union's pregnability in any further dealings with the management of Schoellkopf Products and other employers in Tyler. Those "collateral effects ... continue to affect the relationship of the litigants." *Stotts,* 104 S.Ct. at 2591.

Court has explicitly recognized that when declaratory relief is sought, mootness should not preclude review of a statute that will be enforced in the future against the complainants. *See McCorkle*, 416 U.S. at 121–22, 94 S.Ct. at 1697, 98; *Steffel*, 415 U.S. at 460–73, 94 S.Ct. at 1216–22. The distinction between injunctive and declaratory relief is made, because declaratory relief interferes less with state court processes than does an injunction.[17] *See Steffel*, 415 U.S. 452, 94 S.Ct. 1209. *See also McCorkle*, 416 U.S. 115, 94 S.Ct. 1694 (declaring the injunction moot, but ruling on the demand for declaratory judgment). *But see Stotts*, 104 S.Ct. 2578 (declaring injunctive relief justiciable and apparently abandoning distinction between injunctive and declaratory relief as to mootness). "There is a tendency in declaratory judgment cases to construe the mootness doctrine more narrowly." *Familias Unidas v. Briscoe*, 544 F.2d 182, 189 (5th Cir.1976) (citing *Porter v. Lee*, 328 U.S. 246, 66 S.Ct. 1096, 90 L.Ed. 1199 (1946)).

In demonstrating mootness in the instant case, the defendants are required to bear a heavy burden, since declaratory relief alone is sought by plaintiffs. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Here, the defendants have not made the requisite showing. As long as the statute remains enforceable, the defendants are "free to return to [their] old ways," and hence there is "a public interest in having the legality of the practices settled." *Id.* at 632, 73 S.Ct. at 897.

## III. STATE COURT CONSTRUCTION

Because this action is not moot, the plaintiffs' contentions that Article 5154d unconstitutionally infringes on their First Amendment rights must be addressed. Yet, a federal court "'lack[s] jurisdiction to authoritatively construe state legislation.'" *Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972) (quoting *United States v. Thirty-seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971)). *See also Adamian v. Jacobsen*, 523 F.2d 929, 932 (9th Cir.1975). It cannot sit as a "super legislature" and impose its own narrowing construction on a state statute.[18] *Beckerman v. City of Tupelo, Mississippi*, 664 F.2d 502, 509 (5th Cir.1981). Inasmuch as a federal court must apply state constructions of a state statute, it must be discovered whether any authoritative state court decisions narrow the meaning of the statute, thus making unnecessary federal court review of the statute. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 497, 85 S.Ct. 1116, 1126, 14 L.Ed.2d 22 (1965)).[19] Therefore, state interpretations of Article 5154d will be reviewed.

### A. Section 1, the Numbers-Distance Provision

The Supreme Court of Texas has not determinatively construed § 1, paragraph

---

17. In discussing federal interference with state courts, it is essential to determine whether an action requires federal disruption of state court prosecutions. Currently, no state prosecutions are pending, as a result of the arrests subsequent to the picket in issue. *Sherman v. State*, involving the prosecution of as picketer in the Schoellkopf strike, was finally decided in 1981. *Sherman v. State*, 626 S.W.2d 520 (Tex.Cr.App. 1981) (*en banc*). *Allee v. Medrano*, 416 U.S. 802, 820, 94 S.Ct. 2191, 2202, 40 L.Ed.2d 566 (1974), which involved a challenge to the Texas mass picketing statute, held that "[i]f there are no pending prosecutions and only declaratory relief is sought, then *Steffel* clearly controls and no *Younger* [*v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971),] showing need be made."

18. A federal court can only construe a *federal* statute so as to save it from constitutional infirmity. *See New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 3361 n. 24, 73 L.Ed.2d 1113 (1982).

19. "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on a challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (citing *Dombrowski*, 380 U.S. at 491, *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *U.S. v. Thirty-seven Photographs*, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *cf. Bread v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951)).

1, of Article 5154d (the numbers-distance provision of the statute), which regulates how many picketers can be near an entrance to a workplace, and how far apart they must be from each other.[20] Only four state appellate courts have sought to interpret that section of the statute: *Dallas General Drivers, Local 475 v. Central Beverages, Inc.,* 507 S.W.2d 596 (Tex.Civ. App.—Dallas 1974, writ ref'd. n.r.e.); *Farah Manufacturing Company v. Amalgamated Clothing Workers of America, Southwest Regional Joint Board,* 483 S.W.2d 271 (Tex.Civ.App.—San Antonio 1972, no writ); *Sabine Area Building Trades Council, AFL–CIO v. Temple Associates, Inc.,* 468 S.W.2d 501 (Tex.Civ.App. —Beaumont, 1971, no writ); *Geisler v. Coussoulis,* 424 S.W.2d 709 (Tex.Civ.App. —San Antonio, 1967, error ref'd. n.r.e.). Their constructions of the statute conflict, however, and hence do not provide a conclusive interpretation of it.

The defendants' brief indicates that the state "chooses to rely on the decision of the Dallas Court of Appeals." Intervenor's Supplemental Pre-Trial Brief at 11. In *Dallas General Drivers Local 475 v. Central Beverages, Inc.,* the Dallas Court of Civil Appeals held that the numbers-distance formula "cannot expand the state court's equitable jurisdiction into the domain pre-empted to the National Labor Relations Board by the National Labor Relations Act." 507 S.W.2d at 599. It also held that when labor picketing involved violence or an imminent threat to public order, the National Labor Relations Act did not pre-empt state regulation. *Id.* at 598. Accordingly, under that decision, the state can regulate a labor picket when violence is threatened.

But contrary to the state's argument, a holding regarding pre-emption in a labor context does not narrow this statute. The statute applies to *all* forms of picketing, not simply labor picketing. Even in the area of labor picketing, *Dallas General Drivers* neither explains under what circumstances the statute applies, nor how it should be construed. Moreover, the state's perceived necessity to "choose" this saving construction demonstrates the lack of a single, authoritative construction of the statute by the Texas appellate courts.

The state also suggests that a federal decision, *Medrano v. Allee,* CA No. 67–B–36 (S.D.Tex. June 24, 1976), narrows Article 5154d.[21] There, the district court, in an unpublished opinion, referred to the numbers-distance provision of the statute. The 1976 *Medrano* court did not attempt to dissect the statute, but merely held that "the application of [section 1] of Article 5154d to such specific circumstances was and is unconstitutional." *Medrano v. Allee,* CA No. 67–B–36, slip op. at 5 (S.D.Tex. 1976). Unpublished opinions bear questionable precedential value. *See* 5th Cir.R. 47.-5.3. Moreover, even if the opinion were given weight, its application of the statute to the specific circumstances does not constitute an authoritative narrowing construction, for a federal court has the power to construe a state statute only in the same manner as the state courts. *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972); *United States v. Thirty-seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1409, 28 L.Ed.2d 822 (1971).

Other Texas appellate courts that have considered the numbers-distance formula also have not authoritatively construed the statute. For example, in *Geissler v. Cous-*

---

**20.** *See supra* note 1.

**21.** The case in question has a long procedural history. Originally, a three-judge district court declared the statute unconstitutional. *Medrano v. Allee,* 347 F.Supp. 605 (S.D.Tex.1972). The Supreme Court vacated the judgment in light of *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209 (1974), a decision determining when declaratory and injunctive relief are appropriate. *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191 (1974).

The district court reconsidered *Medrano* in a 1976 unpublished opinion. Both of the two challenges to Article 5154d in federal district court, *Medrano* and *Howard Gault* (in the Northern District of Texas) have declared portions of the statute to be unconstitutional. *See Howard Gault Co., et al. v. Texas Rural Legal Aid Inc.,* 615 F.Supp. 916 (N.D.Tex.1985) (an action involving Texas onion field workers).

*soulis,* the court upheld the numbers-distance formula of § 1, paragraph 1, as applied to the picketing of a Laredo restaurant. Yet, the court in *Geissler* conceded that the application of the mass picketing statute might prove unconstitutional in other circumstances. *Geissler,* 424 S.W.2d at 712. The Beaumont Court of Civil Appeals, in *Sabine Area Building Trades Council v. Temple Associates, Inc.,* 468 S.W.2d at 502, misread *Geissler* as finding constitutional the verbatim provisions of § 1, paragraph 1. In fact, the *Geissler* court did not confirm the legitimacy of § 1, paragraph 1; rather, it only held the numbers-distance formula was constitutional as applied to the facts in that case. *Geissler,* 424 S.W.2d at 712. Finally, *Farah Manufacturing Company v. Amalgamated Clothing Workers of America, Southwest Regional Joint Board,* held that preemption does not affect "the state's power to regulate the numbers of pickets." 483 S.W.2d at 275. Nonetheless, *Farah Manufacturing* did not further interpret the statute, but only remanded the case to the trial court for reconsideration of a temporary restraining order.

■ A federal court cannot choose which of these coequal and conflicting constructions should be "authoritative." *See United States v. Thirty-seven Photographs,* 402 U.S. at 369, 91 S.Ct. at 1409. Further, the state's choice of an interpretation for purposes of this litigation would not preclude it from advancing an alternate, and perhaps diametrically opposed, construction of the statute in future litigation. In this manner, the statute could be narrowed or broadened at the whim of the state and escape any final review. Consequently, absent any authoritative narrowing construction of the statute, the literal

terms of § 1, paragraph 1, will be considered.[22]

#### b. Section 2, The "Intimidating Language" Section

Section 2 of Article 5154d authorizes the arrest of picketers for using "intimidating" language.[23] The state asserts that the Texas Supreme Court narrowed § 2 in *Dallas General Drivers Warehousemen and Helpers v. Wamix, Inc.,* 295 S.W.2d 873 (Tex.1956). In *Wamix,* the trial court enjoined union members from using "insulting, threatening and indecent language toward any Wamix employees, who desire to work, for the purpose of interfering with, hindering, and intimidating such employees." *Id.* at 876. This injunction parallels the mass picketing statutory provision proscribing "insulting, threatening or obscene language, to interfere with, hinder, obstruct, or intimidate, or [which seeks] to interfere with, hinder, obstruct, or intimidate, another in the exercise of his lawful right to work...." Tex.Rev.Civ.Stat.Ann. art. 5154d § 2 (Vernon 1971). Although the *Wamix* injunction could have been issued pursuant to Article 5154d, the Texas Supreme Court neither mentions nor alludes to the statute in its opinion. A case that does not hint of the employment of a statute can hardly be said to narrow it; therefore, a resort to *Wamix* for guidance regarding the intimidating language provision appears to be fruitless. Moreover, the holding would expand the statutory language to include "coercion," which is not mentioned in the statute, thus broadening rather than narrowing § 2. *Id.* at 879. Further, *Wamix* does not discuss the § 2 statutory prohibition against language that will "interfere with, hinder, or obstruct" others. Finally, the state's proffered con-

**22.** The state concedes that the numbers-distance formula of § 1, paragraph 1 of the statute is, on its face, unconstitutionally overbroad "without the limiting construction given to the statute in *Medrano* and *Dallas General Drivers.*" Intervenor's Supplemental Pre-trial Brief, at 10. Absent "limiting constructions," the state admits the mass picketing statute would offend "the constitutional principle" expressed in *Zwickler v. Koota,* 389 U.S. 241 at 250, 88 S.Ct. 391 at 396,

that, " 'a government purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' " (quoting *N.A.A.C.P. v. Alabama,* 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964)).

**23.** *See supra* p. 956 n. 1.

struction requires that "there be evidence that language will be used which is intimidating and coercive in character." *Ibid.* Presumably, the requirement for such evidence has always existed, though not stated in the statute.

Since state court decisions do not narrow the construction of the statute, the facial validity *vel non* of the language section will be analyzed.

## IV. FIRST AMENDMENT ANALYSIS

The plaintiffs argue that the mass picketing statute is overbroad; and that the intimidating language section is vague. It should be noted that two challenged sections of the statute restrict speech in a dissimilar manner. The numbers-distance provision is a time, place, and manner restriction of picketing activities, whereas the intimidating language section prohibits the employment of certain classifications of speech on a picket line, and is thus a content-based regulation. Time, place, and manner restrictions are analyzed differently than are content-based statutes. The two relevant parts of the statute, will, accordingly, be commented upon separately.

### A. *Overbreadth*

 Overbreadth doctrine applies to time, place, and manner statutes and, as well, to content-based regulations. A statute is unconstitutionally overbroad, if it substantially infringes on speech protected by the First Amendment. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984); *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973); *Beckerman v. City of Tupelo, Mississippi,* 664 F.2d 502, 507 (5th Cir.1981). It is not requisite that

the statute be unconstitutional in every application. In fact, the regulation may be constitutional in its effect on particular plaintiffs, but be overbroad, nevertheless, by reason of its potential for unconstitutional reach. *See Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972); *Coates v. City of Cinncinati,* 402 U.S. 611, 619, 91 S.Ct. 1686, 1690, 29 L.Ed.2d 214 (1971). Overbreadth analysis, therefore, requires that cogitable applications of a statute be considered. *Hoffman Estates v. Flipside Hoffman Estates,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). If a realistic danger exists that the statute "will significantly compromise recognized First Amendment protections of parties *not* before a court," *Taxpayers for Vincent,* 104 S.Ct. at 2126 (citing *Erznozik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125) (emphasis added), it must be declared unconstitutionally overbroad.[24]

 In order to posit the realistic uses to which the Texas mass picketing statute might be put, its scope must be determined. In this respect, it is conspicuous, initially, that Article 5154d applies to *all* picketing, regardless of whether it occurs in the context of labor disputes or in other controversies. The statute's caption reads simply "Picketing." Only § 4 refers to organized labor; there, picketing for the purpose of securing the disregard or breach of a collective bargaining agreement is made unlawful. While the legislative preamble speaks of "picketing as exercised by labor organizations," it subsequently widens the coverage to "conduct on the part of labor organizations *or any other person or group.*" (Emphasis added.) *See* Article 5154d historical note.[25] Therefore, the ref-

---

**24.** *See also Oharalik v. Ohio State Bar Assn.,* 436 U.S. 447, 462 n. 20, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978); *Parker v. Levy,* 417 U.S. 733, 760–61, 94 S.Ct. 2547, 2563–64, 41 L.Ed.2d 439 (1974).

**25.** The preamble states, in part:
It is a matter of public knowledge that picketing as exercised by labor organizations is used not only as a means of expression of ideas to

the public generally, but likewise as a means of coercion through the mere presence of a picket line.
Courts may consider the preamble to a statute in construing it. Code Construction Act, Texas Gov't Code Ann. § 311.023 (Vernon 1986). Nevertheless, "[t]he heading of a title, subtitle, chapter, subchapter, or section of a title does not limit or expand the meaning of a statute." *Id.* § 311.024.

erence in the preamble to labor organizations does not override the more general language in the preamble and other sections of the statute.

Another rule of statutory construction further supports the view that the statute applies to all picketing. Were the statute read narrowly as applying only to pickets with labor related grievances, it would discriminate among pickets, based on the content of their expressions, making the statute patently unconstitutional. *Police Department v. Mosley,* 408 U.S. 92, 94, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972) (statute that distinguishes between labor picketing and other picketing unconstitutionally violates due process). But a primary rule of statutory construction—adhered to in Tex.Gov't Code Ann. § 311.021 (Vernon 1986)—requires a presumption that the legislature intended compliance with the Constitution of the United States in the enactment of a statute. The Texas legislature must, therefore, be presumed not to have intended to differentiate labor picketing from other picketing. Instead, it must be inferred that, in keeping with equal protection principles, the legislature sought to restrict this statute to a "time, place, and manner" regulation of all picketing. In determining its facial constitutionality, the mass picketing statute will, therefore, be considered as applying to all picketing.

In this regard, the definition of a picket and picketing assumes significance. The statute defines a "picket" as "any person stationed by or acting for and in behalf of any organization for the purpose of inducing, or attempting to induce, anyone not to enter the premises in question or to observe the premises so as to ascertain who enters or patronizes the same." A "picket" also includes one "who by any means follows employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed."

Additionally, "picketing" encompasses "the stationing or posting of one's person or of others for and in behalf of any organization to induce anyone not to enter the premises in question." Tex.Rev.Civ.Stat. Ann. art. 5154d § 1, paragraph 2 (Vernon 1971).

### 1. *Section 1, paragraph 1, the Numbers-Distance Provision*

The numbers-distance section of the mass picketing statute makes it illegal for "more than two (2) pickets at any time" to be "within either fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets." Tex.Rev.Civ.Stat.Ann. art. 5154d § 1, paragraph 1 (Vernon 1971). This provision, therefore, regulates the time, place, and manner of speech, for the enforcement of this section is not, facially, affected by the content of speech.

■■ The Supreme Court has held that a state may regulate the time, place, and manner of speech, if there is a compelling state interest justifying the restriction. *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). If a compelling interest is shown, nonetheless, the regulation must be content-neutral, narrowly drawn so as to least restrict protected speech, allow alternative means of expression, and, as well, be rationally related to the state interest it is designed to further. *See generally Taxpayers for Vincent,* 104 S.Ct. at 2118.[26] Consequently, in preparation for determining whether the questioned statute was drawn with sufficient precision, its potential for misuse must be pragmatically confronted.

#### a. *Is there a compelling state interest?*

■■ For a restriction on speech to be valid, it must "furthe[r] an important or substantial government interest." *Tax-*

---

**26.** *See also United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1709, 75 L.Ed.2d 736 (1983); *Perry Education Association v. Perry Local Edu-* cators' Association, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

*payers for Vincent*, 104 S.Ct. at 2129. Here, the state maintains that the compelling state interest in restricting the numbers and distance of picketers is the prevention of violence.

█ It is unquestioned that a state may legitimately regulate violence at a picket line, because the First Amendment protects only "peaceful" picketing. *See e.g., Thornhill v. State of Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940) ("the dissemination of information concerning the facts of a labor dispute must be regarded as within the area of free discussion that is guaranteed by the constitution").[27] A state, therefore, has a "substantial" interest in arresting violent picketers. But the statute under consideration is not aimed at violence *per se*. The state characterizes Article 5154d as a preventive measure, and, in fact, the statute "prohibit[s] *conduct* which often *le[ads]* to ... violence." *Sherman v. State*, 626 S.W.2d 520, 524 (Tex.Cr.App.1981) (emphasis added). Furthermore, the state admits that the goal of preventing violence "is achieved at considerable expense to an individual's or group of individuals' right to effectively communicate." Intervenor's Supplemental Pre-Trial Brief at 9. The Supreme Court

has stressed that, while a state has a compelling interest in restricting violent behavior at a picket line, it has no substantial interest in regulating acts that might lead to violence.[28]

In *Thornhill*, the Supreme Court declared unconstitutionally overbroad an anti-picketing statute similar in many respects to the Texas mass picketing statute.[29] There, the Court determined that the declared state interest, the "protection of the community from the violence and breaches of the peace," did not sufficiently justify the statute that was adopted. *Thornhill*, 310 U.S. at 105, 60 S.Ct. at 745. The Court emphasized in *Thornhill* that, because there was no picketing *"en masse,"* claims of a state interest in protecting the community were not credible, and that free speech could be abridged only where the clear danger of a substantive evil arises.

As in *Thornhill*, the numbers-distance formula here in issue is not limited to *"en masse"* picketing, for it prohibits more than two persons from standing near an entrance of a business. The presence of two picketers, both standing fifty feet from a company entrance and from one another, cannot forebode such violence that there is a "significant and legitimate state interest" in arresting those picketers and thereby

---

27. "'Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this court has more than once recognized by remarking on the close nexus between the freedoms of speech and assembly.'" *N.A.A. C.P. v. Claiborne Hardware*, 458 U.S. 886, 909, 102 S.Ct. 3409, 3423, 73 L.Ed.2d 1215 (1984) (quoting *N.A.A.C.P. v. Alabama, ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)).

28. *See Beckerman v. City of Tupelo*, 664 F.2d at 510 (5th Cir.1981): "This Court has said: '[t]he fact that some speech may stir listeners to disagree—perhaps even to disagree violently—does not by that fact alone permit regulation.' *Wiegand v. Seaver*, 504 F.2d 303, 306 (5th Cir.1974), *cert. denied*, 421 U.S. 924, 95 S.Ct. 1650, 44 L.Ed.2d 83 (1975). A state may not keep law and order by depriving citizens of their rights. *Cooper v. Aaron*, 358 U.S. 1, 16, 78 S.Ct. 1401, 1408, 3 L.Ed.2d 5 (1958)."

29. The Alabama statute referred to in *Thornhill v. Alabama* read as follows:

Section 3448. Loitering or picketing forbidden.—Any person or persons, who, without a just cause or legal excuse therefor, goes near to or loiter about the premises or place of business of any other person, firm, corporation, or association of people, engaged in a lawful business, for the purpose, or with the intent of influencing, or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by such persons, firm, corporation, or association, or who picket the works or place of business of such other persons, firms, corporations, or associations of persons, for the purpose of *hindering, delaying, or interfering with* or injuring any lawful business or enterprise of another, shall be guilty of a misdemeanor; but nothing herein shall present any person from soliciting trade or business for a competitive business.

310 U.S. at 90–91, 60 S.Ct. at 738 (emphasis added).

curtailing their speech.[30] *See Taxpayers for Vincent*, 104 S.Ct. at 2128 (citing *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919)). Moreover, the Texas statute is even more restrictive than the statute challenged in *Thornhill*. The *Thornhill* statute applied only to the picketing of businesses. The Texas statute, on the other hand, applies to picketing at "any premises." Additionally, the *Thornhill* statute applied only to labor picketing, whereas the Texas statute reaches more broadly, and realistically could be employed to proscribe picketing activities in many other contexts.

The state has not suggested any other compelling state interest that would justify the anti-picketing statute. For example, the Texas statute is not specifically directed at the state interest in protecting public order at critical locations. Anti-picketing statutes in issue before the Supreme Court have: assured peaceful ingress to and egress from public buildings, *Cameron v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968); regulated picketing near a school, *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); and restricted picketing at or near a courthouse, *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). The reach of the Texas statute, to the contrary, is far more extensive than the regulations that have been upheld, and closely resembles enactments that have been declared unconstitutionally overbroad. *See Coates v. City of Cincinatti*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (declaring unconstitutional an ordinance making it a criminal offense for "three or more persons to assemble ... on any of the sidewalks ... and there conduct themselves in a manner annoying to persons passing by"). *Cf. Carlson v. California*, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed.2d 1104 (1980) (holding unconstitutionally over-

broad an ordinance outlawing the display of a sign near a business to encourage others not to work or purchase goods there).

When a legitimate state interest was not shown by its terms, the Fifth Circuit declared an anti-picketing ordinance overbroad. *Davis v. Francois*, 395 F.2d 730 (5th Cir.1968). The city ordinance involved in *Davis* prohibited more than two persons from picketing in front of a restaurant, a place of business, or public building; but it contained no provisions regarding the time, place, and manner in which picketing was permissible *vel non*. It was determined in *Davis* that the limitations in the Louisiana ordinance were "unreasonable because there is no legitimate state interest demanding that there never be more than two persons picketing or demonstrating at any of these places." *Id.* at 735.

Like the statute in *Davis*, no permissible state interest has been shown to inhere in the requirement that more than two pickets allowed by the Texas statute be required to stay fifty feet from a building entrance and from each other. The state may legitimately seek to prevent mob violence on a picket line—the restriction of violence is a "permissible end" under the Constitution—but the state cannot validly argue that when more than two persons stand fifty feet from each other and from a company entrance, there is, perforce, a clear danger of violence. *See Davis*, 395 F.2d at 735. But assuming, *arguendo*, that such a state interest exists, the manner in which speech is regulated by the statute will be examined.

### b. *Is the section content-neutral?*

The numbers-distance provision presumably is not aimed at a particular group of picketers, because no group is identified by name or description. Tex.

---

**30.** An example of the violence necessary to sustain a state court injunction of picketing is evidenced in *Drivers Union v. Meadowmoor Co.*, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed.2d 836 (1941). In that case, the Court reported "fifty instances of window smashing," "explosive

bombs," "stench bombs," three vendor trucks wrecked and two burned, a store set on fire, a storekeeper and truck driver seriously beaten, and vendor's trucks followed and threatened by carloads of men. *Id.* at 291–92, 61 S.Ct. at 554.

Gov't Code Ann. § 311.021 (Vernon 1986).[31] The section is thus content-neutral.

### c. *Is the provision narrowly drawn?*

In order to regulate speech constitutionally, a statute must be narrowly drawn so as not to infringe on protected speech. *See Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 64 L.Ed.2d 73 (1979). "Only by requiring these *narrowly* drawn and *precise* enactments that aim at *specific* conduct can courts produce a reasonable reconciliation of the minority's right to protest, and the majority's right to peace and order." *Davis*, 395 F.2d at 736 (emphasis added). For that reason, the "present form" and potential uses of the act must be discerned.[32] *See Hill v. City of Houston, Texas*, 764 F.2d 1156, 1163 (5th Cir.1985).

The numbers-distance formula is not narrowly drawn, nor does it allow alternate channels of communication. As written, the questioned statute broadly proscribes more than two persons from standing, fifty feet apart, near a building entrance. There is no threshold number of picketers necessary to trigger the statute, nor a requirement that persons physically block passage into or out of a building. The section thus "denies demonstrators many meaningful methods of expression," *Davis*, 395 F.2d at 735, and forces them to be dispersed, with the result that their effectiveness is hindered.

Legislators are required to make at least *some* effort to limit the reach of a statute which regulates conduct, if the statute may infringe on First Amendment rights. The issue is "not whether the state ... has the power to regulate demonstrations, but whether the means chosen to achieve a legitimate end are so sweeping that fundamental personal liberties are stifled." *Davis*, 395 F.2d at 734. Here, in sum, the numbers-distance formula encompasses too many potential pickets in its sweep.

### d. *Is the section rationally related to the state interest?*

The restrictions imposed by the numbers-distance provision are not rationally related to the alleged state interest of preventing violence, for the fifty-foot limitation is arbitrary. In order to activate its enforcement, the statute does not require physical contact between persons, the blocking of ingress to and egress from an entrance, or even a required number of protesters.[33] Furthermore, no specific degree of violence—or even potential violence—must be reached to prompt the arrest of picketers. The state concedes that "it could just as easily be foreseen that pickets in greater numbers than those permitted under the statute could conduct themselves peaceably and without obstructing anyone." Intervenor's Supplemental Pre-trial Brief at 10.

Additionally, the numbers-distance section lends itself to potential unconstitutional applications. By way of example, a reporter assigned by his newspaper to cover picketing activities at a store conceivably would be subject to arrest for unlawful picketing, if he followed patrons or employees coming to or leaving the store, in order to interview them, or if he observed and

---

**31.** Although there is no claim of discriminatory enforcement of article 5154d, it bears note that the Texas appellate court cases which have construed it all involved labor picketing. It may be conjectured that, in the years since the adoption of the statute, there have been instances of the enforcement of Article 5154d in other circumstances; but apparently none has reached the state appellate courts.

**32.** The State of Texas admits that the numbers-distance provision is unconstitutional in its present form, acknowledging that the section can only be deemed constitutional if limited by

*Medrano* and *Dallas General Drivers*. Intervenor's Supplemental Pre-Trial Brief at 10. As explained previously, neither of these cases authoritatively limits the scope of the numbers-distance formula. *Supra* at 18–21.

**33.** The state misreads the statute to regulate picketers only at a plant entrance, yet the statute limits how closely two picketers stand from each other *anywhere*. Article 5154d, § 1, paragraph 2 allows the arrest of picketers who hinder access to places of work.

reported the names of prominent patrons who disregarded the picketers' placards and entered the store.

The Louisiana ordinance struck down in *Davis* was similarly "sweeping" in its application. *Davis v. Francis,* 395 F.2d at 735. In that case, the Fifth Circuit faulted the city ordinance for "confin[ing] the number of protestors to two at any building without indicating that any more would necessarily cause riots, block the streets, sidewalks, or entrances to the buildings."[34] *Id.* at 734. Because the ordinance was neither "aim[ed] specifically at a serious encroachment on a state interest," nor did it "attempt to balance the individual's right to effective communication and the state's interest in peace and harmony," *id.* at 735, it was held to infringe unduly on First Amendment rights. In this regard, the Fifth Circuit indicated that an acceptable statute would only proscribe picketers from "obstructing or unreasonably interfering with the free ingress and egress to and from" a premises. *Id.* at 736.

The similarities between the *Davis* ordinance and the numbers-distance provision of Article 5154d are striking. Both regulate public issue and private picketing. Each limits the number of picketers. And both extend "to all kinds of facilities." *Id.* at 735. Neither requires disruption as grounds for an arrest, and neither is drafted to allow picketing which does not obstruct peaceful ingress to or egress from a building. Because the numbers-distance provision " 'does not aim specifically at evils within the allowable area of control ... but sweeps within its ambit other activities that constitute an exercise of First Amendment rights,' " it is "overbroad." *Beckerman v. City of Tupelo,* 644 F.2d at 507 (5th Cir.1981) (quoting *Thornhill,* 310 U.S. at 97, 60 S.Ct. at 741). The statute could be revised, certainly, to prohibit its application to constitutionally protected speech, but the legislature has not made the effort.

*Davis v. Williams,* 617 F.2d 1100, 1105 (5th Cir.1980) (Rubin, J., dissenting), *cert. denied,* 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980).

"The requirement of legislative rationality in the service of legitimate purposes protects individuals and their liberties from official arbitrariness or unthinking prejudice." *Aladdin's Castle, Inc. v. City of Mesquite,* 630 F.2d 1029, 1039 (5th Cir.1980). Not only does an overbroad statute "len[d] itself to harm and discriminatory enforcement by local prosecuting officials," but it also "results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Thornhill,* 310 U.S. at 98, 60 S.Ct. at 742. In effect, an overbroad statute "chills" the speech of potential protestors.

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn...." *Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) (citing *Herndon v. Lowry,* 301 U.S. 242, 258, 57 S.Ct. 732, 739, 81 L.Ed. 1066 (1967)); *Grayned v. City of Rockford,* 408 U.S. 104, 116–17, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). The numbers distance provision facially does not allow adequate "breathing space"; its overbreadth—its unnecessary stifling of First Amendment rights—renders it unconstitutional.

2. *Section 2, The Intimidating Language Provision.*

Section 2 states:

It shall be unlawful for any person, singly or in concert with others, *by use of* insulting, threatening or obscene *language,* to interfere with, hinder, obstruct, or intimidate, or seek to interfere with, hinder, obstruct, or intimidate, another in

---

**34.** *See also Reeves v. McConn,* 631 F.2d 377, 385 (5th Cir.1980): "The city argues that the operation of a sound truck in any other manner [other than at a minimum speed of 10 mph] would constitute danger for both motorists and

pedestrians. At the same time, the city offers no evidence to support this claim. Such a generalization is undoubtedly true in certain times and places—but not always."

the exercise of his lawful right to work, or to enter upon the performance of any lawful vocation, or from freely entering or leaving any premises.

(Emphasis added.) Section 2 expressly regulates speech and is thus a content-based statute; as such, it is necessary that it be rigorously tested. *Gooding v. Wilson,* 405 U.S. 518, 521–22, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408 (1970); *see Cohen v. California,* 403 U.S. 15, 18, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284 (1971). "[T]he statute must be carefully drawn or be authoritatively construed to punish *only* unprotected speech and not be susceptible of application to protected expressions." *Gooding,* 405 U.S. at 522, 92 S.Ct. 1103 (emphasis added). Certain categories of speech have been singled out as unprotected by the First Amendment. One form of speech that can be regulated is "fighting words," for they are seen as inevitably leading to violent conduct.

a. *Does the section prohibit only "fighting words"?*

■ The state contends that the intimidating language provision is "akin to a breach of the peace statute," Intervenor's Supplemental Pre-trial Brief at 13, since it prohibits conduct that "interfere[s] with, hinder[s], obstruct[s], or intimidate[s]," rather than proscribe the use of language *per se.* The section, however, restricts the "use of ... language" that interferes with others at a picket. Although the state chooses to label "use of language" as "conduct," this postulation does not appear valid.[35] No aggressive behavior is required to violate the statute; indeed, the terms of the enactment prescribe that a violation occurs, even when a person seeks only *by language* to interfere with, hinder, obstruct, or intimidate another in any of the activities to which the statute refers. Accordingly, a violation of the statute can be made out which is based on pure speech.

The state defends the intimidating language provision from the overbreadth attack under the "fighting words" exception set forth in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and *Youngdahl v. Rainfair,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957), asserting that § 2 focuses on "words coupled with conduct." Intervenor's Supplemental Pre-Trial Brief at 14. In *Chaplinsky,* a member of Jehovah's Witnesses was convicted of violating a statute prohibiting the use of "offensive, derisive or annoying word[s]," when he called the local constable a "racketeer" and a "Fascist". The right of free speech is not absolute, the Supreme Court held, citing cases demonstrating that "certain *well-defined* and *narrowly limited* classes of speech" are not protected. *Chaplinsky,* 315 U.S. at 571–72, 62 S.Ct. at 768–69 (emphasis added). The *Chaplinsky* decision denominated "fighting words" as a subset of the "clear and present danger" exception to First Amendment protection. As with "clear and present danger," "fighting words" must be of a kind *and under circumstances* that trigger action rather than dialogue. *See Eaton v. City of Tulsa,* 415 U.S. 697, 698, 94 S.Ct. 1228, 1229, 39 L.Ed.2d 693 (1974). The vice of "fighting words" relates to their "tend[ency] to incite an immediate breach of the peace" or assault; specifically, that they foment unlawful acts (as is the case in the "clear and present danger" situation). *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769. The statute in *Chaplinsky* had been authoritatively construed by New Hampshire's highest court as having the purpose of preserving "the public peace, *no* words being 'forbidden *except* such as have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed.'" *Id.* at 573, 62 S.Ct. at 770.

---

**35.** *See* L. Carrol, *Through the Looking Glass* 112 (1941).

"'But 'glory' doesn't mean 'a nice knock-down garment,' Alice objected.

"'When I use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'"

"'The question is,' said Alice, 'whether you can make words mean so many different things.'"

Hence, *Chaplinsky* simply prohibited "words plainly likely to cause a breach of the peace by the addressee...."

■ In comparing the construction of New Hampshire's statute with the "intimidating language" provision, it is obvious that the Texas legislation is not aimed at reactive violence or other lawless response; rather, it is addressed to words that interfere with and intimidate others.[36] In *Chaplinsky*, moreover, the statute had been authoritatively narrowed to apply to a narrow group of inciting words, whereas no Texas appellate court has so circumscribed the intimidating language provision.

Nor does *Youngdahl* bolster the state's argument that the statute falls within the fighting words exception. That case involved a labor dispute in which the picketers, after being refused reinstatement, reinstituted their picket line and damaged property. "[T]he enormous amount of abusive language hurled by the strikers at the company employees"—which was "loud and boisterous" and "just bedlam"—led a state court to enjoin members of the union based on findings that *violence was imminent. Youngdahl*, 355 U.S. at 139, 78 S.Ct. at 211. The state court enjoined the strikers from "threatening, intimidating or coercing any of the officers, agents or employees of plaintiff at any place." *Id.* at 137, n. 4, 78 S.Ct. at 210 n. 4. The Supreme Court sustained that portion of the injunction, stating that the issue was "whether or not the *conduct and* language of the strikers were likely to cause physical violence." *Id.* at 138, 78 S.Ct. at 211 (emphasis added). *Youngdahl* cited *Chaplinsky* for the proposition that "[w]ords can be coupled with conduct as to provoke violence...." *Ibid.* In *Youngdahl*, therefore, it was the incitement to violence that concerned the court, not interference and intimidation. Furthermore, the Court carefully related the holding to the narrow fact situation, and indicated that circumstances and conduct, more than words, were the bases of its decision.

■ The Texas statute, contrary to the holding in *Youngdahl*, fails to narrow the set of circumstances or type of conduct which is required to activate its enforcement. Instead, the statute's execution can be initiated by the indeterminate judgment of a local law enforcement officer or other official that a particular word is insulting, threatening, or obscene, and that it is being used for the purpose of intimidation or interference. The statute clearly does not prohibit speech included only within the "fighting words" exception and, in fact, does not deal specifically with fighting words.

The Supreme Court recently dealt with a case involving language that was purportedly intimidating, but in which no showing of violence was made. In *N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1984), black citizens of Port Gibson, Mississippi, banded together to boycott white businesses, in an effort to force the white power structure of the city to recognize and deal with racial problems. Occasionally, boycotters used rough, threatening, and intimidating language to pressure boycott violators. The Supreme Court gave protection to the language, declaring: "Speech does not lose its protected character, simply because it may embarrass others or coerce them into action." *Id.* 102 S.Ct. at 3424. This reasoning alone seems to warrant a declaration of the unconstitutionality of § 2. Moreover, giving consideration to this language, it is salient that the picketers at Schoellkopf Products merely attempted to persuade other employees not to cross the picket line.

### b. *Is the section narrowly drawn?*

■ The Court noted in *N.A.A.C.P. v. Claiborne Hardware*, that "[t]he presence of protected activity ... does not end the relevant constitutional inquiry." *N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. at

---

**36.** Intimidating words cannot be so stringently restricted. *See N.A.A.C.P. v. Claiborne Hard-* *ware*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

913, 102 S.Ct. at 3425. The state can regulate activity in a manner that incidentally affects First Amendment rights, if the regulation is narrowly drawn. When the affected conduct "occurs in the context of constitutionally protected activity, 'precision of regulation' is demanded." *Id.* at 917, 102 S.Ct. at 3427 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)). The Supreme Court has also held that the Constitution requires that the restriction on alleged First Amendment freedoms be *no greater than is essential* to the furtherance of a substantial government interest. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). "While States have broad power to regulate economic activity," *N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. at 913, 102 S.Ct. at 3425, they can prohibit only certain forms of intimidation and coercion in connection with labor disputes. *See Thornhill*, 310 U.S. at 104–05, 60 S.Ct. at 745. If it is assumed, *arguendo*, that the Texas statute seeks to regulate "fighting words," nevertheless, it must be shown to be precisely and narrowly drawn, so as not to cover protected speech.

▋ A carefully drafted statute prohibits only speech that is not protected by the First Amendment; and a statute is deemed unconstitutionally overbroad, if it restricts protected as well as unprotected speech. *See Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1973) (holding unconstitutional an ordinance prohibiting "opprobious language"); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (declaring unconstitutional a statute forbidding words that "tended to cause a breach of the peace"); *Hill v. City of Houston, Texas*, 764 F.2d 1156 (5th Cir.1985) (finding unconstitutional an ordinance making it "unlawful for any persons to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty,

or any person summoned to aid in making an arrest").

▋ The intimidating language section bears likenesses to enactments held unconstitutional in *Lewis, Gooding,* and *Hill.* For example, in prohibiting the use of "insulting, threatening, or obscene language," § 2 resembles the statute restricting "opprobrious language." *See Lewis,* 415 U.S. 130, 94 S.Ct. 970. "Opprobrious language" brings "public disgrace or ill fame" to a person;[37] certainly, "insulting" and "obscene" language could also, in certain circumstances, bring "public disgrace" to an individual. The Texas statute also compares with the *Hill* restriction making it illegal to "oppose, molest, abuse or interrupt" a police officer. *Hill,* 764 F.2d 1156. In fact, the Texas statute is broader in range than the ordinance in *Hill,* for the intimidating language provision could allow the arrest of picketers, even if they were merely to speak in an intimidating manner to persons crossing a picket line or passersby; and an arrest could be made, if language were used "to interfere with, hinder, obstruct, or intimidate or seek to interfere with, hinder, obstruct, or intimidate." Finally, the mass picketing statute is broader than the *Gooding* restriction, which only outlawed words that tended to cause a breach of peace. Under the Texas statute, a picketer need only "seek to" intimidate or obstruct another person. Section 2, then, does not require that a picketer actually breach the peace or that he intimidate another person, in fact.

It is notable that a recent Fifth Circuit decision, *CISPES (Committee in Solidarity With the People of El Salvador) v. F.B.I.,* 770 F.2d 468 (5th Cir.1985), upheld a federal statute that restricts certain speech which the Texas statute also prohibits. The federal statute provides, *inter alia,* that a person who "willfully ... intimidates, coerces, threatens, or harasses a foreign official" is subject to arrest and conviction.[38] *Id.* at 470–71. Additionally,

---

37. *Websters Seventh New Collegiate Dictionary* 592 (17th ed. 1969).

38. Article 5154d, § 2, prohibits "insulting, threatening, or obscene language" as a misdemeanor; similarly, the federal statute involved

the federal statute allows the conviction of a person who "congregates with two or more other persons with intent to violate any other provision of this section...." The Fifth Circuit declared the federal statute constitutional, because there was an "undeniably important government interest of protecting foreign officials and visitors", *id.* at 474, the statute required a "willful" violation, *id.* at 476, and it could be narrowly construed by a federal court, *id.* at 473.

While the federal statute in *CISPES* may initially appear similar to the Texas mass picketing statute, important differences emerge upon careful examination. The federal statute promoted a discrete "important government interest," which was linked with protection of foreign officials from kidnaping, terrorism, and murder. The federal statute can be applied *only* in the vicinity of embassies or foreign officials; therefore, the statute is painstakingly narrow in its application. The Texas statute, on the other hand, stretches broadly, so as to cover any congregation of picketers anywhere. Thus, although it could plausibly be argued that the goal of preventing violence at a picket is as important as the objective of protecting foreign officials, nonetheless, it cannot logically be maintained that the Texas statute is as limited in its geographic scope as the statute construed in *CISPES*.

 The federal statute, moreover, requires that a person "willfully" violate its provisions, ensuring that the specific intent of the protestors be determined.[39] Hence, the statute cannot be arbitrarily enforced, nor can a person be convicted for exercising his First Amendment rights in good faith. *Id.* at 476. The Texas statute offers no such limitations, requires no evaluation of the specific intent of a picketer,[40] and makes an arrest discretionary with a law

enforcement officer, all of which allows for the possibility of capricious and unreasonable enforcement. Finally, the *CISPES* statute, already specific, has been narrowed by a federal court construction. In its dissection of the words, "coerce," "harass," "threatens," and "intimidate," the Fifth Circuit limits the reach of the *CISPES* statute by determining the intent of Congress at the time of its adoption. But, as heretofore pointed out, the Texas statute cannot be interpreted, construed, or limited by a federal court, when no state appellate court has authoritatively determined its interpretation, as is the case here.

*CISPES* thus does not require that intimidating language provision be declared constitutional. Contrariwise, *CISPES* brings to light the particular flaws of the intimidating language section: it has no requirement of specific intent; it cannot be narrowed by a federal court; and it is not tailored specifically to further a compelling state interest.

c. *What are the potential applications of the intimidating language section?*

The intimidating language section itself must be scrutinized, to determine whether it is sufficiently narrow. The words to be judged are "insulting, threatening, or obscene language," used "to interfere with, hinder, obstruct, or intimidate, or [to] seek to" do the same to another person "in the exercise of his lawful right to work;" or to seek to prevent a person "from freely entering or leaving any premises."

 "In determining the meaning of statutory language in the absence of interpretation by the state, the Supreme Court has looked to dictionary definitions." *Beckerman,* 664 F.2d at 509, n. 3. The

---

in *CISPES,* 18 U.S.C. § 112(b), designates one who "intimidates, coerces, threatens, or harasses" a foreign official as a misdemeanant.

**39.** Where a statute encroaches upon freedom of expression, a specific intent to do the acts proscribed by the statute is required. *Hartzell v. United States,* 322 U.S. 680, 686, 64 S.Ct. 1233, 1236, 88 L.Ed. 1534 (1944). *Cf. N.A.A.C.P. v.*

*Claiborne Hardware,* 458 U.S. at 920, 102 S.Ct. at 3429.

**40.** Under the holding of the Texas Court of Criminal Appeals in *Sherman v. State,* 626 S.W.2d at 527–28, a mere knowing or reckless violation of the statute is deemed sufficient.

dictionary must be consulted for the meanings of several of the words in this statute.[41] "Insult" means "to treat with insolence, indignity, or contempt: to affront," or "to make little of."[42] Certainly, a picketing worker would "make little of" or hold "in contempt" a person crossing the picket line—and could verbally inform that person of his displeasure. A number of derogatory words might be used, such as "strikebreaker," "scab," or "fink," which, in certain circumstances, could be construed as "fighting words." But the provisions of the statute in issue would also cover a variety of demeaning words, *e.g.*, "clown," "nitwit," "meathead," "goon," or "turncoat," meant to "make little of" one crossing the picket line. These are not ordinarily "fighting words," for they do not "have a direct tendency to cause acts of violence." *Chaplinsky*, 315 U.S. at 573, 62 S.Ct. at 770. To prohibit the use of "insulting language" is to draw a category of words that is not "well-defined or narrowly limited."[43] *Chaplinsky*, 315 U.S. at 571–572, 62 S.Ct. at 768–69. Clearly, words that are insulting to one person are not necessarily insulting to others.

■ Another type of language prohibited by § 2 is "threatening" language. In *CISPES*, the Fifth Circuit declared the meaning of the word "threaten" to be clear, referring to *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), which held constitutional a statute making it a crime to threaten the life of the President. *CISPES*, 770 F.2d at 476. This limitation of the word obviously cannot be applied to the instant case. *CISPES* interpreted a federal statute similar to *Watts*, wherein the enactment prohibited terms that threaten "foreign officials." In the context of the *CISPES* statute, "threaten" connotes specific words that indicate the speaker intends to undertake "such activities as may seriously alarm or persecute foreign officials." *Ibid.*[44] On the other hand, the anti-picketing statute arises in a different context, labor disputes, where the language employed is "often vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708, 89 S.Ct. at 1401.

Since *CISPES* is not controlling, the dictionary must be consulted. The dictionary defines "threaten" as "to utter threats against," "to give signs or warning: portend."[45] The word "threaten," like insult, covers a broad range of language that may likely be used at a picket line.[46] It is apparent that, without a requirement of willfulness, the word is "susceptible of application to protected expression," *Gooding v. Wilson*, 405 U.S. at 522, 92 S.Ct. at 1106;

---

**41.** "Words ... shall be ... construed according to ... common usage." Code Construction Act, Texas Gov't Code Ann. § 311.011 (Vernon 1986). *See, e.g., Padgett v. State*, 683 S.W.2d 453, 457 (Tex.Ct.App.—San Antonio 1983) ("terrorize").

**42.** *Websters Seventh New Collegiate Dictionary* 439 (17th ed. 1969).

**43.** In *Coates v. City of Cinncinati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), the Supreme Court declared an ordinance unconstitutional for regulating "annoying" conduct. "Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise normative standard but in the sense that no standard of conduct is specified at all." *Id.* at 614, 91 S.Ct. at 1688. In *Coates*, conduct was involved, whereas in Article 5154d, § 2, *language* is regulated. To prohibit "insulting language" is to violate First Amendment precepts more fundamentally than in a regulation of "annoying" conduct.

**44.** Moreover, the *CISPES* statute requires that the speaker "willfully" threaten a foreign official, "a requirement which serves both to further restrict any arbitrary enforcement of the statute, and to reduce the likelihood of conviction for a good faith exercise of expressive rights." *CISPES*, 770 F.2d at 476.

**45.** *Webster's Seventh New Collegiate Dictionary* 920 (17th ed. 1969).

**46.** For instance, a picketer might vociferously shout at a non-striker crossing the picket line, "You'll live to regret going to work for that company." This could be construed as "threatening" language, for the striker might possibly have intended a warning of dire consequences; but the language might also be regarded as a mere prediction of future remorse and guilt on the part of the non-striker, for his conduct in crossing the picket line.

consequently, it is unconstitutionally overbroad.

■ The definition of "obscene" has been subject to a great deal of litigation. *See, e.g., Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Various definitions have emerged, and it has become clear that obscenity does not receive the broad protection of the First Amendment. However, the obscenity defined in such litigation is commonly described as pornography, which consists of photographs, films, and printed materials, rather than spoken words.[47] Manifestly, the language sought to be prohibited by the intimidating language section is not sexually explicit language designed to arouse the listener. Rather, the speech takes the character of the words in *Cohen,* where obscene language was chosen for its emphatic nature.[48] *See Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (protestor's arrest for wearing jacket bearing obscenity invalid). Obscene language is "disgusting to the senses: repulsive," "abhorrent to morality or virtue." [49] Again, the section would allow law enforcement officers to arrest protestors for language that might be common in the workplace or on a picket line [50]—especially more prevalent during times of hostility. The statute therefore, encompasses many types of strong language, and for that reason allows too much discretion in enforcement.

*See Alladin's Castle v. City of Mesquite,* 630 F.2d at 1037.

■ Finally, it must be determined whether language designed to "interfere with," "hinder," "obstruct," [51] or "intimidate" can be prohibited as fighting words. It is of great consequence that the statute embraces words, not conduct, that might affect a listener. *Cf. International Society for Krishna Consciousness v. Eaves,* 601 F.2d 809 (5th Cir.1979) (upholding a requirement that no person "obstruct, delay, or interfere with the free movements of any other person" at an airport). In *CISPES,* the Fifth Circuit determined that "obstruct" was a sufficiently clear standard to withstand an attack for overbreadth. *CISPES,* 770 F.2d at 468. The court based its finding on both *International Society for Krishna Consciousness* and *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) (which held constitutional a prohibition for picketing which obstructed entrance to a courthouse). Yet, the definitions of obstruction in *International Society for Krishna Consciousness* and *Cameron* were both directly linked to "free movement" and "ingress to and egress from" buildings, and these prohibitions, therefore, involved conduct. The court in *CISPES* further qualified its holding regarding vagueness by pointing out that the statute under examination in that case required a "willful" violation. *CISPES,* 770 F.2d at 476. The word "obstruct" in § 2 has not been so qualified, and it applies to *language* that obstructs,

47. *See* Tex. Penal Code Ann. § 43.21 (Vernon 1974).

48. The questioned statute thus appears to regulate profanity rather than obscenity. Profanities are not necessarily fighting words. *See Beckerman,* 664 F.2d at 514 ("While it is conceivable that profanity might, in some circumstances, also constitute ... fighting words, this statute does not confine itself to those situations....").

49. *Webster's Seventh New Collegiate Dictionary* 582 (17th ed. 1969).

50. In a libel case, *Manchester v. International Association of Machinists,* 567 S.W.2d 623, 626

(Ct.Civ.App.—Waco 1978), writ ref'd. n.r.e.), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979), the Waco Court of Civil Appeals held: "We recognize that ... Federal law gives unions license to use intemperate, abusive, or insulting language." However, the provisions of Tex.Rev.Civ.St.Ann. art. 5154d were not in issue in that case. *Cf. Crown Central Petroleum Corporation v. N.L.R.B.,* 430 F.2d 724, 731 (5th Cir.1970).

51. In *Sherman v. State,* 626 S.W.2d at 526, the Texas Court of Criminal Appeals defined "obstruction" as "the rendering impassable or the rendering unreasonably inconvenient or hazardous the free ingress or egress to the struck premises."

rather than to conduct that might accomplish that object. It is difficult to conceive of language that would "obstruct" a person from entering the workplace, for obstruct means "to block or close up by an obstacle," "to hinder from passages, action, or operation: impede."[52] The defendants have not pointed out a means by which words could block a person from entering a workplace. The word "hinder" falls prey to the same defect.

■ The word "intimidate"[53] was upheld by the Fifth Circuit in *CISPES. Id.* at 476 n. 8. Again, the reasoning in *CISPES* is inapplicable to the present action, because the federal statute in *CISPES* was narrowed by the requirement of a "willful" violation. Intimidate means "to make timid or fearful: frightening," "to compel or deter as if by threats."[54] Under certain conditions, a picketer may certainly intimidate by language alone; but the prohibition expressed in the Texas statute is not carefully drawn or aimed at a specific category of behavior accompanying the language. *See Coates,* 402 U.S. at 614, 91 S.Ct. at 1688 ("conduct that annoys some people does not annoy others"). It is conceivable that a person crossing a picket line could be intimidated, if a picketer merely expressed his dislike of such person, for the interpretation of language depends both on the speaker and listener. Consequently, a statute that regulates language

designed to be "intimidating" does not impose merely an "incidental restriction on expression," *Taxpayers for Vincent,* 104 S.Ct. at 2130, and it is, therefore, unconstitutionally overbroad.

■ Finally, a prohibition on speech that "interferes with" another person allows a broad proscription of First Amendment rights. Interfere means "to come in collision or be in opposition; clash."[55] Allowing law enforcement officers to arrest picketers whose language "clashes" with persons who cross the picket line would unconstitutionally condone the arrest of many of the picketers. A labor picket inherently is a "clash" between labor and management, as well as between striking and non-striking workers.[56] Thus, the statute does not provide "definite standards" and is overbroad. *See Beckerman,* 664 F.2d at 511.

### B. *Vagueness*

#### 1. *Section 2, The Intimidating Language Provision*

■ In addition to being scrutinized for overbreadth, the intimidating language section must be examined for vagueness. A statute is unconstitutionally vague, when it (1) deprives citizens of any warning that their conduct may be illegal and (2) invests law enforcement officers with on-the-spot legislative power.[57] *See, generally, Con-*

**52.** *Webster's Seventh New Collegiate Dictionary* 583 (17th ed. 1969).

**53.** "Intimidate" is defined in a false imprisonment case, *Ward v. State,* 642 S.W.2d 782, 783 (Tex.Cr.App.1983), where a dictionary definition is used: " 'To make timid or fearful: FRIGHTEN: esp. to compel or deter as if by threats.' "

**54.** *Webster's Seventh New Collegiate Dictionary* 444 (17th ed. 1969).

**55.** *Id.* at 441 (17th ed. 1969).

**56.** Like the *Thornhill* statute, Article 5154d § 2 subsumes "courses of action ... which in many instances would normally result from merely publicizing, without annoyance or threat of any kind, the facts of a labor dispute. An intention to hinder, delay or interfere with a lawful business, which is an element of the second offense, likewise can be proved merely by showing that

others reacted in a way normally expectable of some upon learning the facts of a dispute." *Thornhill,* 310 U.S. at 100, 60 S.Ct. at 743.

**57.** "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what it prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

*nally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess of its meaning and differ as to its application, violates the first essential of due process.").

In this case, the statute proscribes such broad categories of speech that the meaning of the words, "insult," "threaten," "obscene," "interfere with," "hinder," "obstruct," and "intimidate," becomes unclear.

■ By way of illustration, it would seem obvious that a protester should not be prosecuted for calling another person a "nerd," [58] but, if a police officer conceived that the intimidating language provision was violated by its use, the statute would allow the prosecution. Because of that, a picketer must speculate as to which words are punishable. But due process requires that persons be given fair notice of what actions are illegal, and that the discretion allowed law enforcement officers be limited by explicit statutory standards. *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). As presently drawn, the statute manifestly could have a chilling effect on those who are unclear regarding what is unlawful, and these individuals, on that account, well might restrict "their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377 (1964).[59]

■ The circumstances of this case indicate that union members who called nonstrikers "scabs" [60] had no intention of violating § 2. Nevertheless, the police so interpreted the statute as to arrest the union members for simply using that word. The situation here was not one, as in *Youngdahl*, in which any word was said with the requisite degree of force, by a sufficient number of persons, to create a "fighting words" reaction; and there was no evidence of threatened violence in connection with use of the term. The workers who were leaving the plant were in vehicles, and there were few face-to-face confrontations. If this statute were allowed to stand, local law enforcement officers conceivably could find such pejorative words as "strikebreaker" or "fink" to be in violation of § 2. *Cf. Cohen v. California*, 403 U.S. at 16, 91 S.Ct. at 1783 (refusing to forbid public display of single four-letter expletive when the prohibition would also create a substantial risk of suppressing ideas). Certainly, those contemplating picketing will have no assurance that this will not be the case. Therefore, "persons of common intelligence" cannot determine what words to avoid to remain within the laws; moreover, the discretion of law enforcement officers has not been sufficiently limited.

## CONCLUSION

Picketing claims a historic place in the history of America, providing an opportunity for diverse groups to express their ideas publicly.[61] Article 5154d is not drafted

---

**58.** In a recent case, this court found, after consultation with *amicus curiae*, that the word "nerd," is a "polysemantic neologism," amounting to an "undifferentiated belittlement." *Peggy Martin v. WKM Wellhead Services,* Civil Action No. TY–80–378–CA, slip op. at 14 n. 6 (E.D.Tex. April 4, 1984).

**59.** The § 2 language need only be compared with that of Tex.Penal Code Ann. § 22.07 (Vernon 1974), *Terroristic Threat,* in order to understand the kind of specificity required to narrow a statute sufficiently, so that persons of "common intelligence" can understand what is required.

**60.** *See Letter Carriers v. Austin,* 418 U.S. at 282–283, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745; *Linn v. United Plant Guard Workers,* 383 U.S. at 60–61, 86 S.Ct. at 661–62 (both discussing the use of the word "scab").

**61.** "The right to petition for the redress of grievances has an ancient history and is not limited to writing a letter or sending a telegram to a congressman; it is not confined to appearing before the local city council, or writing letters to the President or Governor or Mayor. Conventional methods of petitioning may be, and often have been, shut off to large groups of our citizens. Legislators may turn deaf ears; formal complaints may be routed endlessly through a

with the precision necessary to save it from the challenges made to its constitutionality. Both § 2 and § 1, paragraph 1, of Article 5154 are in disregard of the First Amendment, since both are unconstitutionally overbroad. Additionally, § 2 is unconstitutionally vague. Accordingly, it is

ADJUDGED and DECLARED that Tex. Rev.Civ.St.Ann. art. 5154d, § 1, paragraph 1, and § 2 are unconstitutional.

bureaucratic maze; courts may let the wheels of justice grind very slowly. Those who do not control television and radio, those who cannot afford to advertise in newspapers or circulate elaborate pamphlets may have only a more limited type of access to public officials. Their methods should not be condemned as tactics of obstruction and harassment as long as the assembly and petition are peaceable, as these were." *Adderly v. Florida,* 385 U.S. 39, 49–51, 87 S.Ct. 242, 248–49 (1966) (Douglas, J., dissenting).